TIMBERLAKE CONSTRUCTION CO.,
Plaintiff–Appellee/Cross–Appellant,

v.

U.S. FIDELITY AND GUARANTY CO.,
Defendant–Appellant/Cross–
Appellee.

Nos. 94–6080, 94–6149.

United States Court of Appeals,
Tenth Circuit.

Nov. 22, 1995.

Sarah J. Rhodes (Mort G. Welch and Murray E. Abowitz, with her on the briefs), Abowitz, Welch & Rhodes, Oklahoma City, Oklahoma, for Plaintiff–Appellee/Cross–Appellant.

Larry D. Ottaway (Darrell W. Downs, with him on the briefs), Foliart, Huff, Ottaway & Caldwell, Oklahoma City, Oklahoma, for Defendant–Appellant/Cross–Appellee.

Before KELLY and BARRETT, Circuit Judges, and OWEN,* Senior District Judge.

OWEN, Senior District Judge.

Defendant-appellant U.S. Fidelity and Guaranty Company ("Fidelity") appeals from an adverse jury verdict in an action commenced by its insured, plaintiff-appellee Timberlake Construction Company.

Timberlake contracted with Wal–Mart Stores to build a Wal–Mart supercenter in Claremore, Oklahoma. It purchased a $4,600,000 builders' risk insurance policy from Fidelity to cover risks associated with construction of the building. The policy covered the period from July 12, 1991 to August 15, 1992. It provided that coverage would terminate when the project was "accepted by the buyer" or, in a separate clause, that

> [T]he building ... under construction (the "project" ...) may not be occupied or put to any use without our written consent and an additional premium, if any, paid. If the "project" ... becomes occupied and you do not tell us, we will not pay for any "loss" that occurs after it has become occupied.

Neither "accepted" nor "occupied or put to any use" was defined in the policy.

July 13, 1992 had been designated by Wal–Mart as its "possession date" based on a letter Timberlake had written Wal–Mart three months earlier in April stating that the building would be substantially complete on July 13 and that "possession date" was never changed. It was acknowledged by Timberlake's president at the time that the project *was* "substantially complete" by that date (*see, infra*). At the beginning of that day, a Monday, only $23,000 (or .0004%) of building costs remained to be completed by Timberlake. Wal–Mart had some forty employees in the building and had already moved in such things as the refrigerated food display cases, walk-in coolers, bakery equipment and security cameras. The telephones were working. The air-conditioners were working, as was the satellite communication disc on the roof. Wal–Mart had laid the carpet and floor tiles and completed the pharmacy. Cash registers, fixtures and other stock were stored in the back, and trucks had arrived outside to be unloaded. At about 7:30 that morning, Timberlake, as had been arranged, turned over to Wal–Mart the keys to the building. Thereafter, Wal–Mart's employees were the only ones with access, or the ability to give access, even to Timberlake. Also that day, Wal–Mart's own corporate policies were imposed on the building, including policies regarding smoking, security, safety and sexual-harassment, among others, all of which were communicated by Wal–Mart to the remaining Timberlake employees. Unfortunately, shortly before noon that very day, a Timberlake subcontractor welding on the roof started a fire which caused some $2 million damage to the building and over $1.2 million damage to Wal–Mart's property.

Timberlake notified Fidelity of the fire later that day and Fidelity immediately sought an available investigator to send to the site. That investigator, Charles Murray, was in Claremore, Oklahoma two days later, Wednesday morning, July 15. By noon of that day, he had met with Timberlake's employees and commenced a tape-recorded interview with Timberlake's President, David Timberlake, who had been at the site on Monday, and was one of the first on the roof after the fire was initially observed. In that taped interview, Timberlake spoke of the prior Monday, July 13, being Wal–Mart's pos-

* The Honorable Richard Owen, Senior District Judge for the United States District Court for the Southern District of New York, sitting by designation.

session date and that Timberlake's contract with Wal–Mart provided "... that Wal–Mart takes over when there's substantial completion." He also said that trailer loads of Wal–Mart stock and equipment had arrived on Monday, some portion of which were unloaded and stored that Monday before the fire. One question and answer in the interview went as follows:

> Q. To the best of your knowledge, except for punch lists and the carpet you mentioned and finishing the parking lot, you were substantially complete at the construction site to the point where Wal–Mart had taken the keys, had rechanged the tumblers and was having the merchandise delivered for setup.

> A. That is correct and I remember I said to the best of my knowledge the tumblers were changed. I've been busy doing other things since then and that's typically what's supposed to happen and I believe that is the case but I need to verify that with Miles Wilson.

Implicit in this and later confirmed was the fact that some forty Wal–Mart employees were at work on the premises. Fidelity also immediately ascertained that Wal–Mart had its own insurance coverage on the building and contents through Insurance Company of North America (sometimes called "INA" or "Cigna"). Fidelity's entry in its files five days after the fire reads:

> 07–17–1992 This is a large fire loss to a Wal–Mart store located in Claremore, OK. We have it insured under a builders risk policy. There is a question of coverage as Wal–Mart took the keys and changed the locks out on the building the day of the fire. I understand that the G/A Charlie Murray is in the process of sending a copy of the contract with Wal–Mart to Mickey James our fire attorney and we are going to see who has the coverage.

Fidelity faxed this information and other documents to its Oklahoma City attorney, Mickey James, for a legal opinion regarding whether coverage existed for this fire loss. James advised that there was no coverage available for Timberlake's claim. INA however took the position that Fidelity's policy, not its own, was applicable to the loss and that Wal–Mart was an additional insured under its terms. INA nevertheless wanted to have the building rebuilt as soon as possible, as it had business interruption coverage for Wal–Mart which would cause it to incur liability in the amount of $500,000.00 per week while the store was not operating. Timberlake also wanted to complete the center to fulfill its contract with Wal–Mart.

At that point, Fidelity, having the view that there was no coverage under its policy, considered either denying Timberlake's claim and filing a declaratory judgment action to adjudicate liability under its builder's risk policy, or working out an agreement with INA to get the building built. It did the latter, and four weeks after the fire, entered into a "non-waiver" agreement with INA[1] to split the damages caused by the fire, pay Timberlake the cost of reconstruction, and resolve the coverage issues between the companies at a later time. Accordingly, three days later, one month after the fire, Fidelity paid a half-a-million dollars to Timberlake on account.[2]

The insurance companies further agreed to allow Timberlake to remain on the project and repair the damage notwithstanding the fact that the fire originated because of apparent malfeasance by one of its subcontractors, and Fidelity agreed to pay Timberlake 10¼% profit on the project even though Wal–Mart had allowed Timberlake only a 3½% profit on its original construction. With this agreement in place, Timberlake began repairs to the Wal–Mart building and looked to both companies for payment pursuant to the non-waiver agreement.[3] Fidelity's first payment

---

**1.** INA's willingness to enter with this agreement necessarily evidences INA's awareness that Fidelity had some basis supporting its questioning coverage under the builder's risk policy.

**2.** Even Timberlake's expert on the trial conceded that this and Fidelity's other payments were acts of good faith.

**3.** The non-waiver agreement provided that payments made to Timberlake would not be construed as admission of liability and any actions the companies might take thereto would not result in a waiver of any defenses they may have to the fire loss claim.

of $500,000, mentioned above, was made before Fidelity received any records from Timberlake as to expenditures or cost estimates. The next payment of $250,000 on August 28, 1992 was made within a week of Timberlake's request. Fidelity made another payment of $311,132 to Timberlake on October 6, 1992 after receiving verification of various expenses on October 1, 1992, and made a final payment of $86,049 on November 23, 1992.

INA on August 17, 1992 made a payment of $500,000 to Timberlake pursuant to the non-waiver agreement. INA then delayed making further payment under the non-waiver agreement because it did not believe Timberlake had supplied adequate documentation of its expenses. Unfortunately, because of this, on October 23, 1992 plaintiff filed suit against both Fidelity and INA for breach of the non-waiver agreement.

INA subsequently made additional payments of $263,640 on December 28, 1992, $366,798 on March 30, 1993, and a final payment during trial to comply with the terms of the non-waiver agreement. INA then settled its dispute with Timberlake.

At the time of the filing of Timberlake's complaint, Fidelity was in full compliance with the terms of the non-waiver agreement, and shortly after the suit was filed it made one small payment in normal course upon immediate receipt of documentation supplied by Timberlake. Timberlake in its initial complaint did not sue Fidelity for bad faith, but rather only for an alleged breach of the non-waiver agreement.[4] It was not until several months later, March 15, 1993, that Timberlake filed an amended complaint accusing Fidelity and INA of acting in bad faith in the handling of the Claremore fire loss. Within fifteen days of the filing of the amended complaint, INA made its final payment and Timberlake was thereby paid in full for its reconstruction costs with, as observed, a 10¼ percent profit.

The trial in this case took place in November, 1993. Since between Fidelity and INA, Timberlake *had* been fully paid its reconstruction costs, the only issues submitted to the jury were the subsequently-asserted claims of bad faith and punitive damages.

The jury found against Fidelity on the bad faith claim, awarding Timberlake $2,001,-423.00 in compensatory damages and $1,334,-282.00 in punitive damages. Upon postverdict motion, Timberlake was granted attorney's fees ($113,274.75), expenses ($18,-508.78), and postjudgment interest on the entire award at 3.57 percent. Fidelity challenges the jury verdict as well as the court's award of attorney's fees and postjudgment interest on the punitive damages. Timberlake cross-appeals and challenges the court's denial of prejudgment interest on the compensatory damages.

■ From a thorough review of the record, we sustain Fidelity's essential challenges. We must, however, first consider Fidelity's contentions that certain items of evidence were erroneously received and certain subject matters were erroneously put before the jury. We address certain of them before turning to Fidelity's major contentions that the bad faith and punitive damage claims were erroneously submitted to the jury.

Fidelity claims the district court erred in allowing Timberlake to use litigation conduct of Fidelity's counsel as evidence of bad faith. Specifically, Fidelity challenges the admission of three things: a letter from Fidelity's counsel to a Fidelity adjuster;[5] the fact that Fidelity filed a counterclaim against Timberlake seeking to recover the monies paid pursuant to the non-waiver agreement; and the fact that Fidelity made a motion to join Wal-Mart in Timberlake's suit as a necessary party. Timberlake in its brief before us relies heavily on counsel's counterclaim and motion as evidence of Fidelity's "malicious intent". We note, however, that Timberlake,

---

**4.** President Earl Timberlake admitted that if INA had made its payments as scheduled, this lawsuit would not have been filed.

**5.** The letter stated: "Enclosed is a copy of plaintiff's response to our motion to dismiss and supporting brief. It looks like we have Timberlake squirming pretty good. I will be filing an application with the court to respond to the issues raised by plaintiff. If plaintiff is only suing to recover on the contract, why did they sue us instead of just suing CIGNA? ...." Appellant's Appendix at 1160.

over its president's signature, specifically acknowledged in a writing dated August 11, 1992, under which it accepted payment by Fidelity of the first one-half million dollars that Fidelity had a right to make such a counterclaim and motion.[6] Even in the absence of Timberlake's specific recognition of Fidelity's right to so proceed, it was error to permit the jury to consider these standard and facially permissible litigation steps as evidence of Fidelity's bad faith.

Neither this Court nor the Oklahoma Supreme Court has directly addressed the general question of whether an insurer's litigation conduct may be admissible as evidence of bad faith. However, related holdings of the Oklahoma Supreme Court, as well as public policy concerns, indicate that such evidence should rarely, if ever, be allowed to serve as proof of bad faith.

The Oklahoma Supreme Court established the tort of bad faith by an insurer in *Christian v. American Home Assur. Co.*, 577 P.2d 899 (Okla.1977). In that seminal case, the court noted:

> We do *not* hold that an insurer who resists and litigates a claim made by its insured does so at its peril that ... it will be held to have breached its duty to act fairly and in good faith and thus be liable in tort.
>
> We recognize that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions. Resort to a judicial forum is not per se bad faith or unfair dealing on the part

of the insurer regardless of the outcome of the suit.

*Christian*, 577 P.2d at 904–05 (emphasis added). "As numerous cases since *Christian* have made clear. [T]he insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a legitimate dispute as to coverage or amount of the claim, and the insurer's position is reasonable and legitimate." *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir.1993) (citations omitted). *Christian* and its progeny must be read together with other case law that sheds light on the relevance of litigation conduct to a bad faith claim. The Oklahoma Supreme Court has held that, in a claim for bad faith, "[t]he action of the [insurer] must be assessed in light of all facts known or knowable concerning the claim at the time [the insured] requested the [insurer] to perform its contractual obligation." *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357, 1362 (Okla.1989); *see Oulds*, 6 F.3d 1431, 1436 (10th Cir.1993), (citing *McCoy v. Oklahoma Farm Bureau Mut. Ins. Co.*, 841 P.2d 568, 572 (Okla.1992)). Thus, if "the focus of a bad faith claim is the insurer's knowledge and belief during the time the claim is being reviewed," as Timberlake itself states in its brief,[7] then the relevance of litigation conduct is severely diminished. "In general, an insurer's litigation tactics and strategy in defending a claim are not relevant to the insurer's decision to deny coverage.... [O]nce litigation has commenced, the actions taken in its defense are not ... probative of whether [an insurer] in bad faith denied the contractual lawsuit."[8] *Palmer v.*

---

**6.** Timberlake's written agreement is as follows:

[Timberlake] understands fully that there is a dispute involving the coverage provided by [Fidelity] insurance coverage purchased by Wal–Mart Stores, Inc. through CIGNA Insurance Company [INA] for the damage which occurred to the Wal–Mart Supercenter, Claremore, Oklahoma, on July 13, 1992. Timberlake Construction Company, Inc. fully understands that by making this loan, [Fidelity] is in no way admitting liability or assuming responsibility and liability for the loss. The loan is being made in an effort to mitigate the damages and facilitate an agreement between the two primary insurance carriers as to liability and coverage.

*Timberlake Construction Company, Inc. further understands that [Fidelity] may, at its option, file a suit for declaratory judgment, naming as defendants not only Timberlake Construction Company, Inc., but may include Wal–Mart Stores, Inc., its insurance carrier, CIGNA Insurance Company, and any other person or persons who might have an interest in the proceeds of any insurance or have any claim as a result of the fire.* (emphasis supplied)

**7.** Appellee's Answer Brief at 21.

**8.** In holding that an insurer's litigation conduct was not relevant to a bad faith claim, the Montana Supreme Court also stated in *Palmer:* "The jury was allowed to consider [the insurer's] legit-

*Farmers Ins. Exchange,* 261 Mont. 91, 861 P.2d 895, 915 (1993) (citations omitted).

Allowing litigation conduct to serve as evidence of bad faith would undermine an insurer's right to contest questionable claims and to defend itself against such claims. As a district court in this Circuit aptly noted, permitting allegations of litigation misconduct would have a "chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law." *International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.,* 850 F.Supp. 1509, 1529 (D.Wyo.1994), *aff'd,* 52 F.3d 901 (10th Cir. 1995). Insurers' counsel would be placed in an untenable position if legitimate litigation conduct could be used as evidence of bad faith. Where improper litigation conduct is at issue, generally the Federal Rules of Civil Procedure provide adequate means of redress, such as motions to strike, compel discovery, secure protective orders, or impose sanctions. *See id.* at 1528–29.

 In light of existing case law and the public policy concerns identified above, we hold that while evidence of an insurer's litigation conduct may, in some rare instances, be admissible on the issue of bad faith, such evidence will generally be inadmissible, as it lacks probative value and carries a high risk of prejudice. *See* Fed.R.Evid. 401, 403. Turning therefore to Fidelity's counterclaim and motion at issue in this case, we conclude that the district court erred in admitting or permitting the use of such evidence as proof of Fidelity's bad faith. Its receipt for that purpose was prejudicial.

Finally, in this area, the lawyer's letter with its self-adulatory comment,[9] in what is otherwise a vacuum is not something a jury should have been permitted to consider as binding on a client. Even if it had any probative value, which we question, its probative value was grossly outweighed by its prejudice, and it should not have been received.

 Fidelity next contends that the district court erred in admitting several letters under the business records exception to the hearsay rule, Federal Rule of Evidence 803(6). At issue are five letters: two letters from David Timberlake to Craig McNew, Wal–Mart's director of construction, dated September 22, 1992, and October 13, 1992; one letter from Timberlake to Charles Murray, a Fidelity adjuster, dated October 5, 1992; one letter from Murray E. Abowitz, Timberlake's trial counsel, to Mickey James, Fidelity's counsel, dated October 13, 1992; and, one letter from Beau Neal, Wal–Mart's insurance agent, to Charles Murray dated August 14, 1992. Fidelity maintains that the business records exception is inapplicable because writing these letters was not within the regular course of the construction business and because the letters contained double hearsay.

Business records are admissible despite the prohibition against hearsay if they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [record]." Fed.R.Evid. 803(6). The rule cautions, however, that business records will not be admissible where "the source of information or the method of circumstances of preparation indicate lack of trustworthiness." *Id.* The rationale behind the business records exception is that such documents have a high degree of reliability because businesses have incentives to keep accurate records. "The business records exception is based on a presumption of accuracy, accorded because the information is part of a regularly conducted activity, kept by those trained in the habits of precision, and customarily checked for correctness, and because of the accuracy demanded in the conduct of the nation's business." *U.S. v. Snyder,* 787 F.2d 1429, 1433–34 (10th Cir.1986), *cert. denied,* 479 U.S. 836, 107 S.Ct. 134, 93 L.Ed.2d 78 (1986). "If any person in the process is not acting in the

imate defense strategy and proper litigation tactics as evidence of bad faith, when the relevant inquiry should have been whether Farmers' had a reasonable basis for denying the claim." 861 P.2d at 915.

9. See Fn. 5 *supra.*

regular course of business, then an essential link in the trustworthiness chain fails...." *U.S. v. McIntyre,* 997 F.2d 687, 699 (10th Cir. (1993)), *cert. denied,* —— U.S. ——, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994). It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business. *See Palmer v. Hoffman,* 318 U.S. 109, 114, 63 S.Ct. 477, 480–81, 87 L.Ed. 645 (1943); Fed. R.Evid. 803(6) advisory committee's note.

■ We turn now to the contents of the five letters at issue, all written during the period of controversy. Three were written by David Timberlake—two of them to Wal–Mart's McNew, and one to Fidelity's Murray. In all three, Timberlake recites his firm's relationship with Wal–Mart and Fidelity focusing on resolving the insurance coverage dispute. None are a record made in the "regular practice" of the construction business. Instead, his letters have all the earmarks of being motivated and generated to further Timberlake's interest, with litigation actually not far around the corner.[10] The same holds true for the October 13 letter from Abowitz, Timberlake's counsel, to James, counsel for Fidelity, demanding that Fidelity cover Timberlake's loss. The letter states that Fidelity was acting contrary to law in not paying Timberlake's claim and threatens a lawsuit.[11] This is clearly not a business record within the meaning of Rule 803(6). Finally, the August 14 letter from Neal to Murray similarly fails to qualify as a

business record. Neal, an agent employed by the brokerage firm that wrote Wal–Mart's INA policy, sent Murray a demand letter, ordering Fidelity to make payment to Timberlake and Wal–Mart. The letter discusses in detail the portion of Fidelity's builder's risk policy outlining when coverage ceases, flatly asserting that the policy was in force because none of the five conditions had been met. The letter, detailing legal authority, was thus clearly a self-serving INA document. At trial, counsel for Timberlake attempted to lay the foundation for the letter as a business record through Mr. Murray. However, Murray testified that in the course of his dealings in the insurance industry, letters from agents were "very rarely" received. Furthermore, he stated that his response to Neal's letter was "[telling] him that I was turning it over to our attorney." The district court nevertheless admitted the letter as a business record based on this testimony. This, too, was error, for the letter was written in anticipation of litigation and therefore was not admissible as a business record within 803(6).

We note that Fidelity had waived objection to the October 5 letter from Timberlake to Murray. But this was a relatively bland letter in which Timberlake was foreshadowing possible damages. It was not a letter proffered in support of Fidelity's alleged bad faith in questioning Timberlake's claim. In any event, viewed against the four letters as to which there was objection, it was completely overshadowed. For example, al-

---

10. In addition, several contained double hearsay. The letter of September 22, from David Timberlake to Wal–Mart's McNew, states: "[Y]ou explained to me that our Company would be removed from future Wal–Mart bid lists until the Claremore matter was 'satisfactorily resolved.'" Similarly, the October 13 letter from Timberlake to McNew states: "I understand from [our] conversation that the insurance companies' inability to completely settle this matter is the only detail that is preventing us from bidding on future jobs with you." This hearsay recitation by Timberlake is essentially contradicted by what Wal–Mart's McNew testified in the case:

> Q. I understood that at some point in time Timberlake was removed from Wal–Mart's bid list.
> A. Yes.
> Q. I understand that you were the person who removed them.

> A. Yes, I was.
>
> * * * * * *
>
> Q. Did the actions of [Fidelity] have anything to do with your basis or reasons for removing Timberlake from the bid list?
> A. No.

11. The letter reads in pertinent part:

> On behalf of Timberlake Construction Company, Inc., I demand that your client, [Fidelity], adjust the loss to the satisfaction of its insured.... [Timberlake] has been, as your client knows, financially weakened by the fact [that Fidelity] has not fully adjusted the loss *as it is required to do under the law....* You are advised if this loss is not fully adjusted to the satisfaction of my client by the close of business on Monday, October 19, 1992, a lawsuit will thereafter be immediately filed.... (emphasis supplied).

though the October 5th letter contained a general reference to Timberlake being stricken from Wal–Mart's bid lists, the September 22 letter has the hearsay implication that McNew of Wal–Mart had himself linked Timberlake's removal from the bid list with Fidelity's conduct. Similarly, the October 13 letter from Timberlake to McNew stated, "I understand from [our] conversation that the insurance companies' inability to completely settle this matter is the only detail that is preventing us from bidding on future jobs with you." [12] The two remaining letters, dated October 13 and August 14, were clearly prepared in anticipation of litigation, containing legal conclusions asserting Fidelity's coverage. In sum, we conclude that the court below abused its discretion in admitting the contested letters into evidence and that the error caused manifest injustice, despite the fact that it was not plain error for the court to have admitted the letter of October 5th.

We now turn to Fidelity's contention that with inadmissible evidence excluded, there was no basis to submit the issue of bad faith, let alone punitive damages, to the jury. At the close of Timberlake's case at trial, Fidelity moved for judgment as a matter of law on the bad faith claim, pursuant to Rule 50 of the Federal Rules of Civil Procedure. The court denied the motion, and review of that denial is de novo. *Bankers Trust Co. v. Lee Keeling & Assoc. Inc.*, 20 F.3d 1092, 1099 (10th Cir.1994). Our inquiry at this point is whether, on the record as it should have been, there was sufficient evidentiary basis for a reasonable jury to return a verdict in Timberlake's favor on its bad faith claim. As is the case where we review an order granting summary judgment, on this appeal we consider only admissible evidence. *See, Gross v. Burggraf Construction Company*, 53 F.3d 1531, 1541 (10th Cir.1995). Fidelity's contention is that where, as it asserts here, there is a legitimate dispute as to coverage, a finding of bad faith is precluded. As a starting point, Fidelity reasons that

there could be no bad faith denial of coverage where it offered evidence from which a jury could have concluded there was no coverage under the policy, even if the jury did not actually reach that conclusion. Fidelity also points to its prompt and voluntary entry into the non-waiver agreement as compelling evidence of good faith.

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured." *Christian v. American Home Assurance Co.*, 577 P.2d 899, 904 (Okla.1977). Violation of this duty gives rise to an action in tort. *Id.* "The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions." *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357, 1360 (Okla.1989). The Oklahoma Supreme Court and this Court have made clear that an insurer does not subject itself to a claim of bad faith merely by disputing coverage. "The insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.'" *Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir.1989) (citing *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 762 (Okla.1984)). So long as there is a legitimate basis for doing so, disputing coverage is not bad faith per se. *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir.1993). We note, though, that a legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith. An insured may pursue a claim of bad faith even where the insurer has a legitimate defense to coverage.[13] However, in order to pursue such a claim, the insured must present sufficient "evidence reasonably tending to show bad faith." *Id.* at 1440. As we stated in *Oulds:*

---

12. But see Fn. 10, *supra*, setting forth McNew's testimony to the contrary.

13. *See Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907 (Okla.1984) (affirming a bad faith judgment despite insurer having several defenses to coverage); *Massey v. Farmers Ins. Group*, 1993 WL 34770 (10th Cir.) *cert. denied* —— U.S. ——, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993). ("*Christian* does not suggest that an insurer's absence of a defense to a breach of contract claim is a necessary predicate to a bad faith cause of action).

Numerous Oklahoma cases have ruled as a matter of law that no reasonable inference of bad faith arises when an insurer denied a claim solely because of the existence of a legitimate dispute. As these cases indicate, the fact that a reasonable jury could find in favor of the insurer based on all facts known or that should have been known by the insurer when it denied a claim is strong evidence that a dispute is "legitimate." ... [In] cases in which the question of bad faith was required to be submitted to the jury, the evidence of the insurer's defense to the underlying claim was so weak that a reasonable inference could be drawn that the insurer denied the claim in bad faith.

*Id.* at 1442 (citations omitted). In sum, "in order to establish [a bad faith] claim, the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim." *Id.* at 1436 (citing *McCoy*, 841 P.2d at 572).

Upon review of the record, we conclude that there was a legitimate dispute as to coverage under the policy, and that Fidelity's position was reasonable in light of the facts known or knowable to it at the time it denied Timberlake's claim. *See Buzzard*, 736 P.2d at 159. Under the terms of the builders' risk policy, Timberlake's coverage terminated when the Wal–Mart project was "accepted" or "occupied" by Wal–Mart. At trial, Fidelity presented evidence from which a reasonable trier of fact could conclude that both conditions had been met on July 13, the day the fire broke out. Miles Wilson, project superintendent for Timberlake, admitted under cross-examination by Fidelity that July 13 was Wal–Mart's designated "possession day" or "takeover day." Fidelity also offered into evidence a letter written by Timberlake's project manager, Frank Narcomi, to Wal–Mart, stating: "[T]his letter shall serve as our 90–day notice prior to possession by Wal–Mart and confirm the date of substantial completion to be Monday, July 13, 1992." Wilson acknowledged that keys were given to the Wal–Mart "takeover team." Greg Epps, co-manager of the Wal–Mart supercenter, testified that before the fire broke out, keys had been turned over to him so that the locks could be changed. Fidelity presented evidence that as many as forty Wal–Mart employees were working in the building. Wal–Mart had also moved a substantial amount of equipment into the store, including security cameras, refrigerated food display cases, a working phone system, a satellite dish, and a pharmacy. In addition, Fidelity offered evidence that on July 13, Wal–Mart's company policies, including a no smoking policy, a security policy, and a sexual harassment policy, were imposed on the building. Based on all of these factors, we conclude that a reasonable jury could very well have concluded that Wal–Mart accepted or occupied the supercenter, and thus Fidelity had at least a legitimate dispute as to coverage.[14]

Since a legitimate dispute as to coverage did exist, then as a matter of law Fidelity did not breach the duty of good faith *merely* by refusing to pay Timberlake's claim. *Thompson*, 875 F.2d at 1462. Thus, Timberlake needed to produce additional evidence of bad faith in order to send the issue to the jury. "The mere allegation that an insurer breached the duty of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination. A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct." *Oulds*, 6 F.3d at 1436 (citations omitted). Our review is de novo and we may consider only admissible evidence. *See Security Nat. Bank v. Belleville Livestock Comm'n Co.*, 619 F.2d 840, 848 (10th Cir.1979)

---

**14.** Timberlake's contention that the building was not "occupied" by Wal–Mart because it was not ready "to receive retail customers" (Answer Brief p. 18) is without merit. We can easily envision a situation where the builder finishes, turns over the keys and leaves, and Wal–Mart, for whatever reason, does not immediately use the building, merely putting in a security staff. It is nevertheless "occupied" by Wal–Mart within Fidelity's builder's policy, even though empty, and the builder's risk policy has terminated.

Considering only admissible evidence, at the core of Timberlake's bad faith claim is its assertion that Fidelity failed to adequately investigate its claim under the builders' risk policy. It appears that Fidelity did not contact anyone from *Wal–Mart* to determine if they regarded the project as accepted or occupied until after coverage was denied. Timberlake's expert witness, John Hammond testified that in his opinion, Fidelity breached its duty of good faith because "[Fidelity] had not completed an investigation. They had only gotten one side of the story." However, we note the side of the story Fidelity had immediately gotten in detail was that of its own insured, on whose statements it was entitled to rely. Hammond also put before the jury the assertion that the duty of good faith includes a duty on the part of the insurer to "use an equal amount of effort to develop information that would lead toward the payment of the claim as well as that would lead toward the denial of the claim." [15] Hammond then stated that Fidelity, from his review of the claims file, had not tried to find support for coverage in this case.

As we noted in *Oulds:* "The investigation of a claim may in some circumstances permit one to reasonably conclude that the insurer has acted in bad faith. This is particularly true if the manner of investigation suggests that the insurer has constructed a sham defense to the claim or has intentionally disregarded undisputed facts supporting the insured's claim." 6 F.3d at 1442 (cita-

tions omitted). Timberlake's evidence of Fidelity's investigation does not, however, suggest a sham defense or an intentional disregard of uncontrovertible facts. Moreover, when a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information. *Id.* at 1442. Timberlake made no such showing. For example, while Hammond, Timberlake's expert, testified that Fidelity breached the duty of good faith by not questioning Wal–Mart representatives about whether, in their view, they had accepted or occupied the supercenter, Wal–Mart's views on this subject would not have changed the underlying *facts* already known to Fidelity, facts from which Fidelity was entitled to form a reasonable belief that the building was either accepted or occupied. Hammond acknowledged this on cross-examination:

Q: Would you agree that if [Fidelity] had done this further investigation, they would have found what we've been talking about here all the time, that Timberlake wrote the 90–day letter saying the building will be substantially complete on July 13th, 1992? Is there any amount of investigation that would change what was in that letter?

A: No.

Q: All right. That Wal–Mart in their language calls this 90 days or July 13th, they call it possession day and that their people, as you've read in the deposition,

---

15. Whether such a duty in fact exists in Oklahoma as Hammond testified, or whether Hammond was sufficiently qualified as an expert to give testimony as to it, we need not decide on this appeal. Cf such authorities as *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978) requiring a claim to be "properly investigated ..." and *Pirkl v. Northwestern Mutual Ins. Ass'n,* 348 N.W.2d 633, 635 (Sup.Ct.Iowa, 1984) where the Court stated at 635:

In the casualty insurance situation, the relationship between insurer and insured is for many purposes at arms length. The insurer has no clearly defined duty of investigation and may require the insured to present adequate proof of loss before paying the claim. The two parties are on opposite sides of the issue rather than being partners on the same side as in the liability insurance situation.

No supporting authorities are cited in the trial record or the appellee's briefs before us for Hammond's definition of the duty, and our research fails to reveal authorities on this point in either Oklahoma or our Circuit.

We further note that this is not the first time our Court has had occasion to address the propriety of testimony from witness John Hammond, as "an expert in 'bad faith denial and investigation of insurance claims ... [under] the industry standard and the laws of the State of Oklahoma.' " *Thompson v. State Farm Fire and Cas. Co.,* 34 F.3d 932, (10th Cir.1994) at 940–1, where the Court also stated:

And what we have already said as to the jury's competence to deal with the bad faith issue on its own confirms the discretionary power of the magistrate judge to bar testimony by the asserted expert [Hammond].

that is the day we want to get control because we're moving stuff in there. Now, is there any amount of investigation that would have changed that?

A: No.

Q: All right. Is there any amount of investigation that would change the fact that at the takeover meeting on July 13th Wal–Mart said, "Certain of our rules are enforced right now. Namely, our no-smoking and proper treatment of ladies." Is there any amount of investigation that would have changed that?

A: No.

Timberlake also contends that it is evidence of bad faith that Fidelity never verified David Timberlake's statement that Wal–Mart in fact changed the locks after it acquired the keys to the existing locks. But whether or not the locks were changed is immaterial where David Timberlake had told Fidelity at the outset the undisputed fact that before the fire Wal–Mart had been given the keys to the locks *that were there* and thus Wal–Mart had control of ingress and egress. Hammond himself acknowledged that Wal–Mart taking the keys indicated that it was taking steps to get control of the building.

Furthermore, Hammond significantly testified:

Q. [H]as anything come to your attention now or from then to now that makes you say that the information that David Timberlake gave to us was false and we have no right to rely on it?

A. No.

Q. You agree that it's not bad faith for an insurance company to take its customer's word?

A. I agree.[16]

Against this background, David Timberlake had told Fidelity two days after the fire that he believed the locks were changed and in any event, the Timberlake employees could gain access only with the assistance of Wal–Mart employees. Timberlake stated:

A: [I]t's my understanding that Wal–Mart changed the—we furnished temporary cylinders and tumblers on all the

locks and the doors with construction keys and we turned these over to them. Then they rekey them and put new tumblers in and have the permanent keys so that construction personnel won't end up with the keys to the store. It is my understanding that this was accomplished on or prior to Monday and that they had the keys on Monday, possession day, when they were to start installing their fixtures and equipment.

\* \* \* \* \* \*

Q: If they changed the locks on the doors and you did not have a set, then you did not have access to the building, is that correct, unless you met with a Wal–Mart representative who let you in?

A: They would be working, that's correct. They would be in the building at all times and after that day would set hours on the building, when the building was open, and, if we needed any different times, they would make that arrangement.

Murray's investigative interview of Timberlake also produced the following information:

Q: To the best of your knowledge, your policy says that—your contract says that Wal–Mart takes over when there's substantial completion. Do you think there was substantial completion except for some parking lot work and hooking up equipment?

A: Yes. Substantial completion by the AI definition is that point at which the building is substantially completed to be used for its intended purpose. In consideration of that, most of the building was substantially complete. We were still laying carpet. We had some paint touch-up that we were doing and they were laying some asphalt in the parking lot and we were obviously—part of our obligation was some gas lines serving the units on the roof and that was being performed. So, it was substantial enough for them to go ahead and start to bring fixtures and things in. They would like to have seen it a little further along on that day, but I would say it was substantially complete.

---

16. Fidelity's investigator's manual directs its investigators to contact the insured in cases of fire

with over $25,000 of damage. That was immediately done here.

Clearly, Fidelity conducted an investigation that gave it an ample basis from which to take a reasonable position that Wal–Mart had taken occupancy and control of the premises and that Timberlake's coverage under Fidelity's builders' risk policy had accordingly terminated. Consequently, given all the information Fidelity's investigation did uncover, as well as the fact that further investigation would have produced nothing of consequence, we are compelled to conclude that any alleged "failure" to further investigate cannot, in this case, support Timberlake's bad faith claim.

Finally, Timberlake contends that notwithstanding it got paid all its reconstruction costs under the Fidelity/INA non-waiver agreement—and it would have received no more had Fidelity been the sole payor—that the non-waiver agreement itself is evidence of bad faith.[17] Timberlake argues that Fidelity entered into the agreement to share the rebuilding costs with INA for the sole purpose of avoiding paying the full amount under the builders' risk policy. Timberlake has no evidence to support this other than the agreement itself. We find Timberlake's assertion to be without merit. First and foremost, Fidelity's entry into the agreement never shielded it from possible liability for the full amount. As its name indicates, the non-waiver agreement preserved the right of each insurer to sue the other to recover any and all monies paid. Thus, Fidelity entered into the agreement knowing that it might eventually be liable for the full amount of the rebuilding costs. In addition, common sense dictates that entry into the non-waiver agreement cannot be construed as bad faith where Fidelity started immediately advancing to Timberlake payments totaling $1,147,000.00 in lieu of exercising its option to go to court and seek a declaratory judgment of no coverage. And, as noted earlier, even Hammond, Timberlake's expert, acknowledged that these payments were evidence of *good* faith.

Thus, no reasonable jury could conclude that it was an act of bad faith by Fidelity when it entered into the non-waiver agreement.

In sum, on the record as we find it should have existed at the close of Timberlake's case, and viewing it in the light most favorable to Timberlake and drawing all inferences in Timberlake's favor, we conclude that there would have been insufficient evidence of bad faith to have permitted the jury to consider the issue.[18] Accordingly, the district court would have been required to grant Fidelity's Rule 50 motion. *Thompson,* 875 F.2d at 1462. We reverse and remand to the district court with the direction that the complaint be dismissed in all respects, and judgment be entered in favor of Fidelity.

---

**17.** Timberlake's Answer Brief at P. 24, listing further evidence of bad faith, reads:
"[Fidelity] failed to send a reservation of rights letter regarding coverage to TCI, contrary to [its] policy [as set forth in its manual containing investigative guidelines.]"
But Timberlake's Answer Brief omits the alternative set forth in the manual immediately following the above language of a "Non–Waiver" which Fidelity executed with INA, Timberlake being its third-party beneficiary.

**18.** Given this, obviously the punitive damage claim fails as well.