**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PAUL ROESLER; PAUL ROESLER,
CRNA, INC.,

   Plaintiffs - Appellees,

v.

TIG INSURANCE COMPANY,

   Defendant - Appellant.

No. 05-7055

E. D. Okla.

(D.C. No. 02-CV-576-W)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

  Paul Roesler, a Certified Registered Nurse Anesthetist (doing business as

Paul Roesler CRNA, Inc.), purchased professional liability insurance through TIG

Insurance Company in May 2002. In August 2002, Roesler was sued for his

involvement in the June 1998 cesarian section birth of a severely brain-damaged

infant. Roesler notified TIG of the suit on August 19, 2002.. On September 27,

2002, TIG informed Roesler it had rescinded his policy based on his failure to

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

include information of the surgical incident in his insurance application. On October 17, 2002, Roesler filed suit for breach of contract and breach of the implied duty of good faith and fair dealing. A jury found in favor of Roesler and awarded him $60,072 for TIG's breach of the insurance contract and $2.31 million in compensatory damages for TIG's bad faith. In addition, the jury awarded Roesler $2.3 million in punitive damages. TIG appeals claiming, *inter alia*, the district court erred in denying its motion for judgment as a matter of law and its motion for a new trial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude the trial court failed to correctly instruct the jury. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Roesler is a certified registered nurse anesthetist (CRNA) and the sole employee of Paul Roesler, CRNA Inc. He and his company held a professional liability insurance policy with St. Paul Fire and Marine Insurance Company from 1989 to 2002. In 2002, St. Paul ceased offering CRNA professional liability coverage. Roesler applied to TIG for a liability insurance policy which provided retroactive coverage for claims from 1989 forward. Roesler considered retroactivity critical because approximately twenty percent of his work involved the delivery of babies and malpractice liability continues until the child turns nineteen.

On June 22, 1998, Roesler administered anesthesia during the emergency cesarean section birth of fourteen-year-old Amanda Burton's daughter, Tala. The baby was born with signs of severe hypoxia, a lack of oxygen in utero which may result in brain damage, and scored a bare minimum on the Apgar tests.[1] Roesler testified it was a night he was "never going to forget." (R. Vol. IV at 1045a.) He described the child's condition as "the worst one that I had seen . . . where the baby was still alive." (*Id*. at 1053a.) He was aware at that time there was a problem with the baby and the outcome could be bad. He was correct; Tala had profound, permanent neurological damage.

Two days after the Burton birth, the hospital asked Roesler to write a narrative of the events. Although Roesler had been verbally consulted post-surgery on prior occasions, this was his first request for a written narrative. Roesler knew there was a controversy as to whether the other members of the team had timely responded and whether Dr. Claypool, the leading physician, had advised the team it must come to the hospital immediately. Roesler wrote a narrative addressing those points.

In August 2001, the Burtons filed suit against Dr. Claypool and the hospital, but did not name Roesler as a defendant. Roesler testified that shortly

---

[1] Apgar score is "an index used to evaluate the condition of a newborn infant based on a rating of 0, 1, or 2 for each of the five characteristics of color, heart rate, response to stimulation of the sole of the foot, muscle tone, and respiration with 10 being a perfect score." Merriam-Webster's Collegiate Dictionary (10th ed. 1998).

before the August suit was filed, he spoke with Claypool about its likelihood. He stated Claypool told him the Burtons would probably sue the doctor and the hospital, but not Roesler. Several days later, Roesler read in the newspaper the suit had been filed, but other than the names of the parties, no details were provided. In September 2001, Roesler met with the hospital's attorney, Leah Kinsey, to discuss his knowledge of the relevant events. Roesler testified he did not receive a copy of the complaint, nor did he seek to obtain one.

Prior to receiving TIG coverage in May 2002, Roesler was asked to fill out an application and a supplementary application, also known as a "no-known-loss letter." The application form, completed in March 2002, contained question #9 which asked: "Are you aware of any facts or circumstances (including a request for records) that might give rise to a claim against you?"[2] (R. Vol. VI at 1722a.) Roesler checked "no."

The no-known-loss letter, completed in May 2002,[3] contained the following language:

Except that which is described below, I the undersigned have no:
. . . .

---

[2] At the time Roesler filled out the application, the underwriters were working on revisions to question 9. Later applications phrased the question, (now # 2), "Are you aware of any facts or circumstances (including a request for records from a patient or their family, an Attorney or Risk Manager) that might give rise to a claim against you?" (R. Vol. VI at 1734a.)

[3] At trial, the testimony indicated Roesler may have misplaced the original supplemental application form, requested another and later sent it to TIG.

-4-

[Bullet Point 2] knowledge of information relating to the providing or withholding of professional services which might result in a claim; and/or
 . . . .

[Bullet Point 6] knowledge or information relating to the providing or withholding of past professional services that resulted in . . . a patient's death or neurological injury.

(*Id*. at 1719a.)  Roesler signed the supplemental application without mentioning the Burton birth or lawsuit in the "Exceptions" section.

TIG issued the requested policy on May 22, 2002.  The policy contained a "prior knowledge exclusion" barring coverage for claims arising from professional services that "could reasonably have been expected to result in a Claim, Incident or Suit, as of the date the Insured applied for this policy." (*Id*. at 1838a.)  Because he received a retroactive policy from TIG dating back to 1989, Roesler did not purchase "tail" coverage (permanent coverage for the periods he was insured by St. Paul) from St. Paul. (*Id*. at 1721a.)

Less than three months after Roesler secured his policy, on August 12, 2002, the Burtons filed suit against Roesler.  In this second suit, the Burtons claimed "Amanda Burton was not taken to the operating room until after 2 a.m., due to the late arrival of the 'delivery team,' including Paul Roesler, CRNA." (*Id*. at 1771a.)  On Monday, August 19, 2002, Roesler telephoned TIG to report the lawsuit.[4]  He spoke with claims adjuster, Jennifer Williams.[5]  Williams'

---

[4]  TIG has two departments with separate duties regarding TIG's insurance policies.  The underwriting department drafts and approves applications after an

contemporaneous notes reflect that Roesler told her about the events of June 28, 1998, and insisted the call that night was not a "stat" request. (*Id*. at 1821a.) The notes also indicate Roesler told her he wrote a detailed report of the events of that night "because it seemed like a situation where there could potentially be a lawsuit." (*Id*.) The notes mark this statement with quotations and an asterisk. Williams stated she did so because it "raised a red flag." (R. Vol. III at 800a.) Williams testified she asked Roesler when he first learned the baby was brain damaged and noted Roesler responded, "about six months ago when [the] doc[tor] & hosp[ital] were sued." (R. Vol. VI at 1821a.)

Williams then spoke with Leah Kinsey, the attorney representing the hospital in the Burton lawsuit. Her notes of this conversation state Kinsey had spoken with Roesler "on several occasions as his dep[osition] has been requested" and "additionally [Kinsey] had contact [with] him during [the] peer review process." (*Id*. at 1823a.) During this investigation, Williams recognized Roesler's

---

evaluation of risk. The claims department deals with the insured under the policy. Thus, the decision to defend and pay claims, disclaim an insured's claim or provide a defense under a reservation of rights is made within the claims department. The decision to rescind a policy is within the jurisdiction of the underwriting department. The TIG witnesses in the claims department were Jennifer William, her supervisor, Eugenia Mulhern, and Mulhern's supervisor, Lauree Barreca. The underwriters were Jeff McDonald and Mark Brostowitz. Although the decision to rescind Roesler's policy was made by the underwriters, it was based on discussions between the two departments.

[5] Williams spoke with Roesler twice between August 19 and August 30, 2002, when she left town to participate in an unrelated mediation.

-6-

retroactive policy had been written recently, in May 2002, and he had not reported the incident to his former insurer. Williams spoke with her supervisor, Eugenia Mulhern, because she was concerned Roesler's claim may not be covered under the "prior knowledge exclusion" of the policy. Mulhern advised Williams to contact Donald Dorfman, an insurance attorney in California, to ask him to examine the file for potential policy coverage issues.

On August 23, 2002, Dorfman e-mailed Williams a preliminary coverage opinion. Based on Roesler's statements to Williams, Dorfman suggested the "prior knowledge" exclusion may apply and that there may be grounds for rescission based upon material nondisclosure. Dorfman also stated, "TIG will want to be confident that it has done what it reasonably can do to corroborate the facts as reflected in the interview notes before disclaiming and perhaps rescinding the policy." (*Id.*) These preliminary comments were provided to Jeff McDonald of the underwriting division. McDonald asked Lauree Barreca to contact attorney Savannah Sellman for an opinion on whether rescission would be appropriate.

During Williams' next conversation with Roesler she informed him there may be some question regarding his coverage due to possible misrepresentations about his knowledge of a potential lawsuit. Roesler replied that he did not mention the incident on his application because he did not believe he would be sued. Suit had already been filed against the doctor and the hospital and he was not a named party. Williams left town after this conversation on another matter

and Mulhern took the lead on the Roesler claim.

On September 3, 2002, Mulhern spoke with Roesler about his apparent expectation of the lawsuit against him. He explained the allegations in the suit were groundless and again explained that once the first lawsuit was filed without naming him, he assumed he would not be sued. Mulhern's notes also indicate Roesler told her he learned of Tala Burton's brain damage "when the suit was filed." (R. Vol. VI at 1952a.) Mulhern then telephoned Dorfman and relayed the substance of her conversation with Roesler. They determined Dorfman would draft questions for Roesler while Mulhern would investigate the first lawsuit's allegations and early discovery.

The next day, Mulhern spoke with Kinsey. Kinsey explained the basis of the original lawsuit and told Mulhern there was no issue with the administration of anesthesia. Rather, the claim involved the timing of the operating room crew's response. After her conversation with Kinsey, Mulhern retained attorney Steve Peterson to represent Roesler.

At approximately the same time, TIG received a letter from Roesler faxed to Williams and Mulhern. The letter stated:

> When I filled out the application for coverage, I did have knowledge of the suit by Amanda Burton against the hospital and the obstetrician; but I did not know, nor should I have known, that I might be a party to that suit. The allegations made by the plaintiff had nothing to do with my performance and I could not reasonably foresee that I might be named as a party to the suit some six months later.

-8-

(*Id*. at 1730a.) However, approximately one hour later, TIG received a copy of the original lawsuit which did contain an allegation implicating Roesler. Paragraph 6 of the Complaint alleged, *inter alia*:

> The nurses providing the intrapartum nursing care and nursing obstetrical anesthesia care breached their duties with respect to Amanda Burton's intrapartum labor and delivery nursing care and obstetrical anesthesia.

(*Id*. at 1768a.) At trial, Roesler conceded the discrepancies between these two documents could raise a legitimate question regarding his veracity.

On September 5, Mulhern requested Dorfman write a formal coverage opinion. He sent his opinion on September 12, 2002, stating Roesler's explanation of why he did not expect a lawsuit raised a "credible factual basis for the insured to avoid the prior knowledge exclusion based on an objectively reasonable belief that no potential claim was presented." (*Id*. at 1749a.) Dorfman offered to address the issue of rescission separately if TIG wished, but at that point recommended TIG defend with a reservation of rights under the policy while investigation continued.

TIG received Sellman's formal opinion the next day. Even though Sellman had not reviewed Dorfman's letter, she agreed Roesler's explanation for his answers regarding his knowledge of a potential lawsuit was "plausible" and did not suggest the prior knowledge exclusion be invoked (*Id*. at 1757a.) Nonetheless, she concluded Roesler's answer to bullet point 6 was cause for

rescission. She opined TIG had a legitimate dispute as to coverage because it could reasonably believe he intentionally misrepresented his "knowledge or information relating to the providing or withholding of past professional services that resulted in a patient's neurological injury." Because Roesler knew of Tala Burton's brain injury and subsequent lawsuit at the time he answered the question, Sellman advised TIG that it could reasonably believe Roesler intended to deceive the insurance company under Oklahoma law. Had TIG known of the Burton incident, it could have independently evaluated the possibility of a claim before issuing coverage and, at the least, carved out an exception to the claim. Based on Roesler's misrepresentation by failing to provide the Burton information in response to bullet point 6, Sellman recommended TIG rescind the policy. She concluded, at a minimum, TIG had a "legitimate dispute as to coverage." (*Id*. at 1757a.) Sellman also recommended TIG continue defending Roesler for 30 days so he could make alternative arrangements for his defense.

At this point, TIG had three options. It could (1) disallow Roesler's claim, (2) continue defending under a reservation of rights and later rescind if warranted, or (3) rescind. On September 27, with no further investigation, TIG sent Roesler a rescission letter drafted by Sellman. The letter identified Roesler's answer to Bullet Point 6 as the basis for the rescission but also referenced potential difficulties with Question # 9 and Bullet Point 2. After acknowledging Roesler's explanation for his answers to Question # 9 and Bullet Point 2, the letter

-10-

continued as follows:

> However, you learned that Tala Burton suffered brain damage and was mentally retarded at the time you learned of the suit against the hospital and Dr. Claypool, no later than "early 2002," and before you completed the supplemental declaration to your application for insurance on May 3, 2002. You failed to reveal Tala Burton's neurological injuries in response to the question whether you had knowledge of information relating to professional services that resulted in a patient's neurological injury. This question on the application was not based on whether you subjectively believed a claim would be asserted, only whether you knew of any neurological injuries to a patient.

> The omission of this information is a material misrepresentation under Oklahoma law. *See Wagnon v. State Farm Fire and Casualty Co.*, 146 F.3d 764, 768 (10th Cir. 1998) (applying Oklahoma law) ("a misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented.") If TIG had known of the incident involving Ms. Burton, TIG could have conducted its own evaluation and investigation of whether a claim was likely to be asserted against you before issuing the Policy; at the very least, TIG could have carved out an exception from coverage for the Burton claim.

(*Id*. at 1707-08a). Roesler received the letter while at work on October 1, 2002.

On October 14, 2002, Roesler received approval from an insurer in the secondary market [6] for a non-retroactive policy at a premium approximately $6,000 more per year than TIG's policy.[7]

---

[6] An insurer in the "secondary" or "non-admitted" market accepts applicants who do not meet normal underwriting guidelines. These insurers do not need to meet the stringent rate requirements of admitted insurers regulated by state departments of insurance.

[7] Throughout the trial, TIG officials conceded they knew the effect of rescission would be to void all coverage for Roesler back to 1989. They also knew securing new insurance would be more difficult because the application for

Roesler filed suit against TIG on October 17, 2002, for breach of contract and bad faith seeking compensatory and punitive damages. Shortly thereafter, the Burton's voluntarily dismissed the lawsuit against Roesler. On January 4, 2003, after the dismissal of the Burton suit, TIG mistakenly sent Roesler a Reservation of Rights letter informing him TIG would conduct his defense subject to its continuing investigation of possible misrepresentation.

On August 1, 2003, Brostowitz sent Roesler a letter informing him his policy had been formally reinstated and no premium was requested. However, the Burton claim was excluded from the new policy. Brostowitz testified this was a business decision intended to limit damages in the event Roesler's suit was successful.

Less than six months after TIG reinstated Roesler's policy, TIG decided to cease offering professional liability insurance to CRNAs. Therefore, it notified Roesler and its other customers that it would not be renewing their policies. However, it did offer "tail" coverage for its customers at a cost of approximately $4,000. Roesler declined this offer because he "didn't want to do business with a company that treated [him] like that." (R. Vol. IV at 1040a.) As a result, Roesler remained uninsured for events occurring between 1989 and October 1, 2002.

Roesler's claims were presented to a jury in April 2004. At the close of Roesler's evidence, TIG moved for judgment as a matter of law. The trial court

every insurer asked whether the applicant ever had a policy rescinded.

-12-

denied the motion. TIG renewed its motion at the close of all evidence and also moved for a new trial. These motions were also denied. The jury awarded Roesler $60,072 for TIG's breach of contract. For TIG's bad faith, the jury awarded Roesler $2.31 million in compensatory damages and $2.3 million in punitive damages. This timely appeal followed.

## II. DISCUSSION

TIG claims it is entitled to judgment as a matter of law on Roesler's bad faith claim because it had a reasonable, good faith basis to believe there was a legitimate dispute as to whether Roesler made a material misrepresentation on his insurance application with TIG. In the alternative, TIG maintains it is entitled to a new trial because the trial court erroneously instructed the jurors that it must find TIG acted in bad faith if it found Roesler had not intended to deceive TIG in his application. Finally, TIG claims it is entitled to a remittitur or a new trial because the award of over $2 million for emotional distress is clearly excessive.[8]

A.      Judgment as a Matter of Law

TIG maintains the court erred in denying its motion for judgment as a matter of law on Roesler's bad faith claim. "A judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no

_____

[8] "Because this is a diversity action, we apply the substantive law of the forum state . . . ." *Advantage Homebuilding, LLC. v. Maryland Cas. Co.*, 470 F.3d 1003, 1007 (10th Cir. 2006) (citation and quotations omitted). In this case, we apply Oklahoma law.

reasonable inferences which may support the opposing party's position." *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 685 (10th Cir. 2007) (citation and quotations omitted).  We review the district court's decision de novo, considering the entire record in the light most favorable to the non-moving party.  *Id.*  "The question is not whether there is literally no evidence supporting the nonmoving party but whether there is evidence upon which a jury could properly find for that party. For a jury to properly find for a party, the party must present more than a scintilla of evidence supporting its claim."  *Id.*

TIG asserts the evidence was insufficient to support the bad faith and punitive damages awards.  Roesler argues there was abundant evidence TIG manufactured the alleged legitimate dispute in bad faith.  Unfortunately, before we can discuss the issues and evidence, we must take a moment to debunk many of Roesler's arguments which are unsupported by law or fact.  We are mindful we must allow all reasonable inferences in favor of the non-moving party.  However, we need not endorse inferences premised on deliberate confusion, inaccurate hypothetical questions, or misstatements of earlier testimony to induce misleading testimony from a later witness.[9]  Therefore, we must separate concocted or

---

[9]  For example, Sellman was one of the last witnesses to testify.  During cross-examination, plaintiff's counsel asked, "Did you know that the claims people in this case have all testified they made the decision to rescind this man's insurance policy before they hired either you or Mr. Dorfman; did you know that?"  (Vol. V at 1459a.)  This question misrepresented the previous testimony. In fact, the uncontested testimony established rescission was an option  being considered but no final decision had been made until after TIG received Sellman's

-14-

irrelevant "evidence" from evidence actually presented to the jury.

### 1. Sham or Irrelevant Evidence

#### a) *Lawyer-Shopping*

Roesler argues evidence of bad faith can be inferred from TIG's "lawyer-shopping" based on Jeff McDonald's request that Barrecca hire Sellman shortly after Dorfman rendered his informal opinion. Roesler alleges it established an inference TIG went to Sellman because it did not like Dorfman's advice. There is no evidence supporting such an inference.

Uncontested evidence established Dorfman was retained to opine solely on the policy coverage issue, not rescission. His informal opinion arrived via e-mail to Williams on August 23, 2002.[10] Williams forwarded the e-mail to McDonald the same day. Dorfman's informal opinion, rendered before knowledge of Roesler's explanation, stated he believed the Burton suit was excluded from

_____

opinion. Moreover, the evidence consistently revealed TIG's claims department employees provided input but the underwriters made the decision to rescind Roesler's policy after Sellman provided her legal opinion.

[10] Every witness with knowledge of the matter so testified. In addition, Dorfman's final opinion, sent on September 12, 2002, specifically recognized he had not been retained to opine on rescission. Indeed, even though he recommended more investigation before refusing to cover the claim, he further stated: "There are also grounds to consider a policy rescission based on the same failure to disclose this C section delivery as a potential claim at the time of application for coverage. We can address this separately should you wish to assess this further." (R. Vol. VI at 1750a.) The fact that Dorfman commented on rescission does not lead to an inference he was retained to provide an opinion on the matter.

coverage under the prior knowledge exclusion, and separately, there may be grounds for rescission of the policy based upon material nondisclosure." (R. Vol. VI at 1800a.) He recommended further investigation.

Uncontradicted testimony further established it was at this point TIG hired Sellman to address the rescission issue. Thus, at the time TIG hired Sellman, Dorfman was recommending coverage be denied. It was only *after* Sellman was retained that Dorfman learned of Roesler's September 4, 2002, explanation. While Dorfman changed his opinion regarding the prior knowledge exclusion, there is no evidence TIG contacted Sellman to report Dorfman's final conclusions or gave any other direction to Sellman's formal opinion, sent the day after Dorfman's. Indeed, Sellman agreed Roesler offered a "plausible" position as to his prior knowledge of a lawsuit against him. However, Sellman concluded Roesler's admission he knew of Burton's injuries before he completed his application was sufficient evidence of misrepresentation as to Bullet Point 6. (R. Vol. VI at 1757a.) The timing and substance of the two legal opinions provide no basis for Roesler's insinuation TIG went "lawyer-shopping" in bad faith or that the two legal opinions were contradictory.

### b) Knowledge of Brain Injury

Roesler also argues TIG's bad faith is demonstrated by its failure to resolve whether Roesler knew Tala Burton suffered brain injuries prior to completing his application for insurance. The evidence allows no question of fact on this issue.

-16-

Williams' notes specifically state Roesler told her he learned of Tala Burton's injuries when he heard about the lawsuit against the doctor and the hospital. Mulhern's notes do not contradict this statement, but merely state Roesler told her he learned of the injuries at "the time of the lawsuit."[11] In fact, Roesler never denied this knowledge. When asked at trial why he answered Bullet Point 6 in the negative, Roesler did not say he did not know about Tala Burton's injuries. Rather, he explained he believed the question asked whether *his* administration of anesthesia caused Tala Burton's brain damage and, because he did not believe it did, he did not mention the incident. Given the uncontested evidence, all reasonable inferences necessarily lead to the conclusion Roesler learned about Tala Burton's neurological injuries, at the latest, in August 2001. Therefore, there can be no inference TIG acted in bad faith by declining to further investigate this issue.

### c) *Post-Litigation Conduct*

Roesler argues TIG's post-litigation conduct – the post-rescission Reservation of Rights letter, reinstatement of the policy and the offer of a tail policy – is evidence of bad faith. He asserts this evidence was appropriately

---

[11] Plaintiff's counsel deftly managed to confuse Mulhern during cross-examination by insisting her failure to note which specific lawsuit Roesler was referring to during their conversation (the one against the hospital or the later suit against Roesler) raised a question of fact as to when Roesler knew of Burton's injuries. However, Mulhern consistently testified Roesler told her he knew of Burton's injuries at the time of the lawsuit against the doctor and the hospital.

considered by the jury "in determining the reasonableness of TIG's initial decision to rescind the policy in light of its attempt after litigation to somehow 'cure' its conduct." (Appellee's Br. at 44.)

These post-litigation activities have no relevance to TIG's alleged bad faith. *Hale v. A.G. Ins. Co.*, 138 P.3d 567, 571-72 (Okla. Civ. App. 2006) ("[T]he analysis in bad faith cases indicates the cutoff for relevant evidence is the date of payment or denial of the claim."). The duty of good faith and fair dealing exists during the time the claim is being reviewed. Once a lawsuit is filed, to hold an insurer's acceptable litigation tactics as evidence of bad faith would be to deny the insurer a complete defense. *See Timberlake Const. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 340 (10th Cir. 1995) ("[s]uch evidence should rarely, if ever, be allowed to serve as proof of bad faith."). "[A]llowing litigation conduct to serve as evidence of bad faith would undermine an insurer's right to contest questionable claims and to defend itself against such claims resulting in a chilling effect on insurers, which could unfairly penalize them by inhibiting their lawyers from zealously and effectively representing their clients within the bounds permitted by law." *Sims v. Travelers Ins. Co.*, 16 P.3d 468, 471 (Okla. Civ. App. 2000).

Even if the post-litigation events are considered, there is no inference of bad faith. TIG readily admitted the decision to reinstate Roesler's policy was intended to mitigate damages and, as such, is not evidence of prior bad faith. As

-18-

to the January 2003, reservation of rights letter, Barreca testified she sent the letter by mistake. Even so, at the time the letter was sent, the underlying suit had already been resolved and nothing could be gained by this mistake.

### d) Attorney Opinion Letters

Finally, Roesler repeatedly insinuated at trial that TIG's failure to provide him the letters from Dorfman and Sellman with the letter of the rescission is evidence of bad faith. For example, in the examination of Jeff McDonald, the following colloquy occurred:

> Q. Are you proud that your company has taken the position that they're proud of how they treated [Roesler] because they treated him in good faith?
>
> A. I, I'm aware that we don't feel we've acted in bad faith here.
>
> Q. Well, if your company is satisfied they've treated him fairly, don't you think one of the things they should do is be proud to show Mr. Roesler those two legal opinions from the beginning?
>
> TIG Counsel: Objection, your honor, argumentative and object under Timberlake.
>
> Court: Overruled.
>
> * * * *
>
> A. I just, I don't know that we were ever asked to do that.
>
> Q. Well, does this man, who is not a lawyer, does he have to ask you specific little questions after you've denied his claim and say, Guys, did you up in Chicago hire a couple of lawyers that told you that you could, you could rescind this policy; does he have to ask that before you'll give it to him?
>
> TIG Counsel: Objection, relevance your Honor.

-19-

Court:          Overruled.

(Vol. III at 662-663a). The same type of questioning continued with Williams and Barrecca. Roesler also testified TIG never told him before the lawsuit it was relying on opinions from lawyers to rescind the policy. In closing, plaintiff's counsel told the jury that good faith required TIG "to tell [Roesler] everything." (R. Vol. V at 1545a.)

TIG maintains its failure to provide Roesler its lawyers' opinions at the time of rescission is irrelevant to bad faith. Moreover, it contends the trial court's admission of counsel's insinuations through this line of questioning is an abuse of discretion, or in the alternative, plain error. In response, Roesler asserts that "simply because there is not a law holding it is bad faith for an insurer not to inform an insured about evidence it obtains from a lawyer, this does not mean it is not unreasonable in one case or another to fail to do so." (Appellee's Br. at 64.) Roesler's response ignores basic concepts of attorney-client privilege.

The attorney-client privilege is codified at Okla. Stat. tit. 12, § 2502. It protects communications between an attorney and the client "who consults an attorney with a view towards obtaining legal services or is rendered professional legal services by an attorney." *Id*. at § 2502 (A)(2). The client retains the "privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." *Id*. at § 2502 B; *see also, Scott v.*

*Peterson*, 126 P.3d 1232, 1235 n.3 (Okla. 2005). As a general matter, "the client has a reasonable expectation that . . . disclosure of such information may be judicially compelled only in accordance with recognized exceptions to the attorney-client and work product privileges." Okla. Stat. Ann. tit. 5, Ch. 1, App. 3-A (Rules of Prof'l Conduct (Scope)). Consequently, TIG had no duty to expressly waive its privilege.

An insurance company, just as any other individual or entity, has the right to seek confidential legal advice.[12] *See Sims v. Travelers Ins. Co.*, 16 P.3d at 471 (documents relating to communications between the insurer and its attorneys were subject to attorney-client privilege); *see also Twin City Fire Ins. Co. v. Burke*, 63 P.3d 282, 285-86 (Ariz. 2003); *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 155 n.2 (Ohio 2000); *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 294 (D. Mont. 1998). It is only when such advice becomes at issue in a *legal proceeding* that the client may be required to disclose the advice of counsel under a theory of implied waiver. Roesler does not claim there was any implied waiver of attorney-client privilege at the time TIG rescinded his policy.

The letters from Dorfman and Sellman were privileged communications given in response to TIG's request for professional advice. Roesler fails to identify any case law where a party, including an insurance company, acted

---

[12] "A 'client' is a person, public officer, or corporation, association, or other organization or entity, either public or private . . . ." Okla. Stat. tit. 12 § 2502 2.A.

-21-

unreasonably or in bad faith by failing to voluntarily sacrifice its attorney-client privilege prior to litigation. Oklahoma law certainly does not imply such action might be necessary. He makes no attempt to explain why it was unreasonable for TIG to maintain its attorney-client privilege nor does he claim TIG did not fully comply with Oklahoma law regarding notice to him of its decision.[13] Thus, the district court erred in allowing Roesler to argue TIG's retention of its attorney-client privilege was evidence of bad faith.[14]

2. Legitimate Dispute/Inadequate Investigation

Having addressed the "facts" we will not consider in support of the jury's finding of TIG's bad faith, we turn to TIG's contention the district court

_____

[13]  Oklahoma's Unfair Claims Settlement Practices Act, Okla. Stat. tit. 36 § 1250.7, provides a casualty insurer's notification of a claim denial must include "reference to [the specific] policy provision, condition, or exclusion" that is the basis for denial. The Act does not afford a private right of action for a violation of its provisions. *Lewis v. Aetna Health Care, Inc.*, 78 F.Supp.2d 1202, 1206 (N.D. Okla. 1999). However, "the Insurance Code in general, and the Act in particular, reflect a clear State policy of regulating insurance in part by prohibiting the bad faith failure by insurers to pay promptly the rightful claims of insureds." *Id*.


[14]  TIG complains that Roesler spent a substantial amount of time at trial focusing on Question # 9 and confused the jury by implying TIG decided to rescind based on Roesler's response to Question # 9 and Bullet Point 2 as well as Bullet Point 6. The bulk of the language in the rescission letter suggests Roesler's answer to Bullet Point 6 is the reason for rescission. However, the rescission letter is unclear whether Roesler's answers to all these provisions influenced TIG's decision. Therefore, Roesler did not unfairly explore TIG's reference in the letter to Question # 9 and Bullet Point 2. On remand, TIG can present evidence clarifying its position and the jury can reach its own conclusions.

-22-

erroneously denied its motion for judgment as a matter of law. TIG claims the

uncontroverted evidence established its good faith belief of a legitimate coverage

dispute. Roesler argues the failure to conduct an adequate investigation negates

the legitimacy of the coverage dispute.

### a) Applicable Law

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act

in good faith with its insured." *Christian v. Am. Home Assur. Co.,* 577 P.2d 899,

904 (Okla. 1977). If an insurer fails to fulfill this duty, the insured can bring a

bad faith action in tort. *Id.* Insurers are statutorily barred from declining

coverage on the basis of their insured's misrepresentations and omissions except

in limited circumstances. Those circumstances are set out in Okla. Stat. tit. 36,

§ 3609, which provides in part:

> All statements and descriptions in any application for an insurance
> policy or in negotiations therefor, by or in behalf of the insured, shall
> be deemed to be representations and not warranties.
> Misrepresentations, omissions, concealment of facts, and incorrect
> statements shall not prevent a recovery under the policy unless:
>
> 1. Fraudulent; or
>
> 2. Material either to the acceptance of the risk, or to the hazard
> assumed by the insurer; or
>
> 3. The insurer in good faith would either not have issued the policy,
> or would not have issued a policy in as large an amount, or would not
> have provided coverage with respect to the hazard resulting in the
> loss, if the true facts had been made known to the insurer as required
> either by the application for the policy or otherwise.

 Okla. Stat. tit. 36, § 3609(A).

-23-

Oklahoma defines insurance misrepresentation as follows:

A 'misrepresentation' in insurance is a statement as a fact of something which is untrue, and which the insured states with the knowledge that it is untrue and *with an intent to deceive,* or which he states positively as true without knowing it to be true, and which has a tendency to mislead, where such fact in either case is material to the risk.

*Scottsdale Ins. Co. v. Tolliver*, 127 P.3d 611, 613 (Okla. 2005).  An "omission" is "*an intentional omission* to disclose a fact or condition which is material to the acceptance of the risk or the hazard assumed."  *Id*. at 613-14.  An "incorrect statement" is "a statement of fact which is untrue and known to be untrue, or so carelessly made that an *intent to deceive may be inferred*."  *Id*. at 614.

TIG maintains it reasonably believed Roesler intended to deceive the company when he did not disclose the Burton case in response to the question regarding neurological injuries to a patient in Bullet Point 6.  Therefore, TIG maintains it had a legitimate dispute as to coverage vitiating a bad faith claim. The Oklahoma Supreme Court has recognized "[l]egitimate disagreements can arise concerning the amount of coverage, cause of loss, and breach of policy conditions, and the tort of bad faith does not prevent the insurer from resisting payment or resorting to a judicial forum to resolve a legitimate dispute." *Brown v. Patel*, 157 P.3d 117, 126 (Okla. 2007); *see also Christian,* 577 P.2d at 905; *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.,* 71 F.3d 335, 343 (10th Cir. 1995) (applying Oklahoma law).  In such cases, "[r]esort to a judicial forum is not

-24-

per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit." *Christian,* 577 P.2d at 905. "The decisive question is whether the insurer had a good faith belief, *at the time its performance was requested*, that it had justifiable reason for withholding payment under the policy." *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991) (quotation omitted). Evidence leading to different inferences requires the jury to resolve the reasonableness of insurer's conduct, "by a consideration of the circumstances in each case." *Badillo v. Mid-Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005). At a minimum, an insurer's culpability must be "more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award . . . ." *Id*. at 1094.

The existence of a legitimate dispute does not, by itself, resolve a bad faith claim. Rather, "it shifts the burden to the insured to present additional evidence of bad faith." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006) (applying Oklahoma law). "Most commonly, the insured asserts an insurer's failure to conduct an investigation reasonably appropriate under the circumstances." *Id*. This is exactly what Roesler claims here. To defeat TIG's affirmative defense, he must demonstrate "(1) the manner of [TIG's] investigation hints at a sham defense or otherwise suggests that material facts were overlooked, or (2) [TIG] intentionally disregarded undisputed facts supporting the insured's claim." *Id*.; *see also Oulds v. Principal Mut. Life Ins. Co.,* 6 F.3d 1431, 1442

-25-

(10th Cir. 1993) (applying Oklahoma law).

### b) Parties' Contentions

TIG contends an evaluation of the evidence necessarily leads to the conclusion it had a good faith belief Roesler made a material misrepresentation when answering Bullet Point 6. The undisputed evidence revealed Roesler knew of Tala Burton's severe neurological injury prior to completing TIG's application. Therefore, he knew he had professionally participated in a procedure which resulted in severe neurological damage prior to his negative response to Bullet Point 6 in the supplemental application. TIG witnesses testified the only reasonable response would have been to report the Burton incident because every CRNA knows his professional services are provided as part of a team, not as an individual. Therefore, Bullet Point 6 referred to Roesler's professional services as part of a surgical team where the procedure resulted in neurological injury. In addition, Roesler had stated in writing the Complaint against the hospital did not contain allegations against him, but when TIG received a copy of the Complaint a short time later, it specifically referred to the nurse anesthetist. TIG contends no additional investigation was necessary because it would not change these facts.

TIG claims it further demonstrated good faith by contacting attorneys to seek legal input on the issues. "[R]eliance on the advice of counsel can be a defense to a bad faith suit, [but] the reliance on counsel's advice must be reasonable." *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 174 (Okla.

-26-

2000). "The advice of counsel is but one factor to be considered in deciding whether the carrier's reason for denying a claim was arguably reasonable." *Id*. "The ultimate question is whether sufficient evidence was presented to show insurer's purported reliance on its attorney's advice was unreasonable." *Id*. TIG claims the uncontested evidence demonstrated it consulted two attorneys on independent questions of coverage. They followed the advice of both by accepting Roesler's explanation to his answers to question # 9 and Bullet Point 2. TIG further asserts, given the facts it knew at the time, it was not unreasonable to proceed on Sellman's opinion that Roesler's answer to Bullet Point 6 indicated an intent to deceive which legally justified the decision to rescind the policy. TIG maintains there was no evidence it intentionally overlooked evidence in Roesler's favor or that counsel's advice was unreasonable.

Roesler contends TIG failed to properly investigate because it never asked *him* why he answered Bullet Point 6 in the negative. Roesler testified he understood the question to be limited to whether *his* past professional services caused death or neurological damage, not whether he was part of a team where such a result occurred. According to Roesler, because there was no evidence Burton's injuries were caused by his administration of anesthesia, his answer to Bullet Point 6 was not a misrepresentation nor was his interpretation of the question unreasonable.

Roesler points to TIG's modified application which was in use after he

-27-

completed his application, but prior to the rescission, as evidence that TIG knew there could be more than one understanding of Bullet Point 6. The new application asked whether the applicant has "attended any cases where a medical error was made by you *or another practitioner*, which resulted in an incident report or investigation, that you have not yet reported to your insurance carrier." (Question 10, Application dated May, 10, 2002, Vol. VI at 1740a) (emphasis added). He contends this modified language demonstrates TIG knew Bullet Point 6 should have been more specific if it wanted to discover facts regarding cases in which he "attended," or results involving "another practitioner." In essence, Roesler claims TIG's failure to ask him a simple question creates a question of fact as to whether TIG inadequately investigated his claim and, in turn, whether it unreasonably relied on Sellman's advice because it did not provide her with all relevant facts.

### c) *Adequate Investigation of Intent*

The intent underlying the validity of the claim can be determined only after an insurer conducts "an investigation reasonably appropriate under the circumstances." *Buzzard*, 824 P.2d at 1109. "When a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information." *Timberlake*, 71 F.3d at 345. Several Oklahoma cases have addressed the adequacy of an investigation into the insured's knowledge or

-28-

motivation in completing an application or claim.

In *Brunson v. Mid-Western Life Insurance Company*, the insurer refused to make medical payments alleging Brunson made false representations in his insurance application. 547 P.2d 970, 972, 973 (Okla. 1976). While filling out the health insurance application with the insurance agent, Mr. and Mrs. Brunson were asked "whether Brunson or any family member ever had or been told that they had any disease of kidney, bladder, prostate or female organs, or were now pregnant." *Id* at 970. Mrs. Brunson and the agent laughed at the question regarding Mr. Brunson's possible disease of female organs or pregnancy and the agent answered the question in the negative. Later, the insurer discovered Mr. Brunson had been treated for prostatitis over eight years previously but had not had trouble with this condition since.

At trial, Mr. Brunson testified he understood that the medical questions asked subsequent to a question dealing with ailments and treatments within past five years limited later questions to the same time period. Brunson further testified the agent did not question him concerning his prostate and he understood the question to deal with female organs and pregnancies. The Oklahoma Supreme Court affirmed the district court's conclusion that Brunson had not intended to deceive the insurer and laid the fault at the feet of the agent. *Id*. at 973. While this case did not address bad faith or reasonable investigation, the court clearly considered the insured's explanation of his subjective motivations when

-29-

answering the questions to be of substantial weight.

In *Hall v. Globe Life and Accident Insurance Company*, Mrs. Hall applied for a life insurance policy for her husband, naming herself as beneficiary. 968 P.2d 1263, 1264-65 (Okla. Civ. App. 1998). She checked "no" to the question whether Mr. Hall had been treated for cirrhosis within the preceding twelve months but told the agent that Mr. Hall had chronic hepatitis. Upon Mr. Hall's death about ten months later, the death certificate identified the cause of death as "hepatorenal syndrome, primary biliary cirrhosis." *Id*. at 1265. Globe Life also received a report from Mercy Hospital, signed by Mr. Hall's treating physician, which had a hand-written note "cirrhosis non A or B." Based on this information, Globe denied payment due to Mrs. Hall's alleged misrepresentation in the application.

Mrs. Hall filed a claim for bad faith, arguing her statement in the application "was a representation based upon the knowledge of the applicant, not a warranty that the insured does not, in fact, have the specified illnesses." *Id*. at 1265. The court concluded the jury could find Globe Life's investigation improperly focused on determining whether Mr. Hall in fact had cirrhosis more than twelve months prior to the application and did not investigate the "critical fact" – Mrs. Hall's knowledge of Mr. Hall's illness. *Id*. at 1265-66. The court concluded the evidence created a jury question. *Id*. at 1266.

In *Crews v. Shelter General Insurance Company*, the insurer made the

-30-

decision to void Mr. Crews' home insurance policy because he allegedly misrepresented his criminal history when he denied a prior felony conviction. 393 F.Supp.2d at 1170 (W.D. Okla. 2005). After Crews's home was destroyed by fire, he told the adjuster he had been convicted of a felony. In determining whether to void the policy, the insurer relied "exclusively on the insurance application, Mr. Crews's answer to [the] criminal history question during the taking of the recorded statement, and the court documents indicating that Mr. Crews had, in fact, been convicted of a felony in 1979." *Id*. at 1173. No one asked Crews to explain the apparent inconsistency prior to rescinding his policy. *Id*. at 1174.

When finally asked, Crews contended his answer in the insurance application was due to his honest belief his felony conviction resulted in a deferred sentence, as opposed to a suspended sentence. He further testified he never saw the Judgment and Sentence that indicated he received a suspended sentence, but learned of his mistake only after the insurer's rescission of his policy. The district court refused to grant summary judgment in favor of the insurer because the insurer "failed to investigate the possibility that Mr. Crews may have misrepresented his criminal history *without* any intent to deceive." *Id*. at 1178. Specifically, the district court stated:

> The [insurer's] employees who examined whether (and eventually decided that) [the] policy should be voided . . . testified that they made no effort to determine whether Mr. Crews misrepresented

himself with an intent to deceive, which they could have accomplished by simply asking Mr. Crews about the apparent inconsistency between the insurance application and his recorded statement. Instead, they focused their attention on the mere fact that a misrepresentation was made, and then made the assumption that the misrepresentation was made willfully and intentionally based on Mr. Crews's acknowledgment of his criminal history during the recorded statement. Plaintiffs argue that [the insurer] essentially ignored the intent to deceive requirement in contravention of Oklahoma law and to their detriment. They further argue that had [the insurer] investigated Mr. Crews's state of mind, they would have been alerted to the obvious fact that Mr. Crews did not willfully misrepresent himself.

*Id.* at 1178-79.

Most recently, in *Sims v. Great American Life Insurance Company*, the district court reviewed the adequacy of an investigation into the insured's cause of death. 469 F.3d at 892-893. There, the insurer was not required to directly ask Mrs. Sims why she did not believe her husband's death in a single car crash was a suicide. Instead, the insurer was entitled to rely on Mrs. Sims's sworn (but recanted) statement to the police regarding her husband's mental state that night and the fact every official report listed suicide as the cause of death. "The conclusions in these reports were not made at the behest of Great American -- the medical examiner and investigating officer had no connection with Great American." *Id.* at 892. The insurer was aware of the family's rejection of suicide, the lack of depression in Mr. Sims's medical history and the fact he was intoxicated when he left in the car. Although the insurer could have further investigated by asking Mrs. Sims about the obvious inconsistency between her

-32-

sworn police statement and her later statements, her response "would not have changed the underlying facts upon which Great American was entitled to rely: the missing persons report, the death certificate, the medical examiner's report, and the accident report." *Id*. at 893. As a result, we determined the district court improperly submitted the issue of bad faith to the jury. *Id*.

Applying the reasoning of these cases to the facts before us, we conclude the district court did not err in denying TIG a directed verdict. As in *Hall*, Roesler presented sufficient evidence to conclude TIG may have failed to investigate a critical fact. As in *Crews*, Roesler's understanding of the question may have been clarified had TIG only asked him. Although the insurer in *Sims* was not investigating an insured's intent to deceive where the motivation of the insured is the ultimate question, at the very least TIG would have had to show some independent documentation from several sources verifying the facts it relied upon. This it cannot do. Thus, the district court correctly presented the jury with the questions regarding the reasonableness of TIG's investigation and, in turn, whether a legitimate dispute existed.[15]

---

[15] A breach of the duty of good faith and fair dealing "may be shown without proving conduct on the part of an insurer that was intended to harm, injure or deceive its insured." *Badillo*, 121 P.3d at 1093 n.6. In contrast, punitive damages are available only when a jury finds by clear and convincing evidence the insurer acted in reckless disregard of its duty or intentionally and with malice. *Id*. at 1105-06; Okla. Stat. tit. 23, § 9.1. Thus, a finding of breach of the duty of good faith and fair dealing does not necessarily imply punitive damages are appropriate. *Id*. TIG does not separately seek a directed verdict on the submission of punitive damages to the jury. Therefore, we need not address

B.    Jury Instructions

TIG claims two jury instructions incorrectly stated the law of Oklahoma.

We review challenges to jury instructions de novo. *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 964 (10th Cir. 2002). We consider the jury instructions "as a whole to determine whether they cover the issues presented by the evidence and accurately state the [applicable] law." *United States v. Schuler,* 458 F.3d 1148, 1155-56 (10th Cir. 2006) (quotation omitted). "The appellate court must consider all that the jury heard and, from the standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine these issues." *White v. Am. Airlines, Inc.*, 915 F.2d 1414, 1420 (10th Cir. 1990) (quotation omitted).

TIG maintains Instruction 23 improperly required the jury to find if TIG's coverage position was wrong, TIG must have acted in bad faith. It further contends Instruction 24, while stating the correct law in the first sentence, contains the same flaw as Instruction 23 in the second sentence. TIG contends these flaws were prejudicial to its case warranting a new trial. Roesler maintains a new trial is not necessary because (1) TIG did not raise these objections at trial, (2) TIG invited the error by submitting a proposed instruction with the same flaw,

the heightened standard necessary for punitive damages as applied to the facts of this case.

-34-

and (3) the error did not prejudice TIG when viewed in light of the entire record.[16]

We disagree with Roesler.

Instruction 23 stated in relevant part:

> [I]f you find plaintiffs . . . did not make a material misrepresentation in the policy application with an intent to deceive, defendant, TIG Insurance Company, was not justified under the law in rescinding the policy it issued to plaintiffs and the rescission breached the implied duty of good faith and fair dealing.

(R. Vol. I at 229a.)  Instruction 24 provided:

> An insurer does not breach the duty of good faith to pay a claim by litigating a dispute with its insured if there is a legitimate dispute as to coverage or the amount of the claim and the insurer's position is reasonable and legitimate.  An insurer may legitimately and in good faith dispute a claim based on a material misrepresentation in the insured's application for insurance so long as the misrepresentations were made with an intent to deceive by the insured in applying for the policy.

(*Id*. at 230a.)  Oklahoma law does not require the insurer's position in a dispute to be correct to avoid liability.  Even if the jury finds for the plaintiff on the dispute and renders a verdict for breach of an insurance contract, this does not mean the insurer acted in bad faith.  *Bailey v. Farmers Ins. Co.*, 137 P.3d 1260, 1264 (Okla. Civ. App. 2006) ("Insurers are free to make legitimate business decisions (and mistakes) regarding payment, as long as they act reasonably and deal fairly with

---

[16]  Roesler half-heartedly argues the instructions were correct when taken as a whole, but does not point to any instruction that cures the misstatement of law found in both Instruction 23 and 24.  No instruction informed the jury it could find TIG had a legitimate dispute as to coverage even if Roesler did not have an intent to deceive when completing the application.

their insureds."); *see also Hays v. Jackson Nat'l. Life Ins. Co.*, 105 F.3d 583, 584 (10th Cir. 1997) (Breach of contract claim wrongly dismissed because a genuine issue of material fact existed with respect to insurer's intent when making representation.); *Oulds*, 6 F.3d at 1442-45 (Rejecting insurer's rescission position but affirming summary judgment on bad faith claim because "the denial of a claim based upon a legitimate dispute does not imply bad faith."); *City Nat'l Bank & Trust Co. v. Jackson Nat'l Life Ins.*, 804 P.2d 463, 469 (Okla. Civ. App. 1990) (Insurer's good faith belief of material misrepresentations of fact, if accepted by the jury, is sufficient to avoid liability even if the jury returned a verdict against Insurer for breach of contract.). However, dismissal of insured's bad faith claim affirmed.)

Although TIG did not object to Instructions 23 and 24 at its first opportunity, it did raise specific objections to both instructions to the trial court. As to Instruction 23, TIG objected "because even if we improperly rescinded the policy, that [does not] automatically mean that it was in bad faith. . . . [U]nder Oklahoma law . . . there is a two-step process; there's a breach and then there's bad faith." (R. Vol. V at 1508a.) TIG proposed the instruction read "if you find plaintiffs . . . did not make a material misrepresentation in the policy application with an intent to deceive, Defendant, TIG Insurance Company, was not justified under the law in rescinding the policy" and removing the remainder of the language. The district court overruled the objection. TIG then proposed the

following language be added to Instruction 24:

> An insurer may legitimately and in good faith dispute a claim based on material misrepresentations in the insured's application for insurance so long as **there is evidence, which if believed would support a finding that** the misrepresentations were made with an intent to deceive by the insured in applying for the policy.

(*Id*. at 1509a, addition in bold.)[17]  Consequently, there is no question TIG clearly made the specific objections it now argues on appeal.

Moreover, contrary to Roesler's assertion, the proposed Instructions 23 and 24, together, do not make the same mistake found in the instructions as given. Had the district court accepted the proposed instructions, Instruction 23 would preclude a finding of bad faith triggered solely by a finding Roesler did not have an intent to deceive. Proposed Instruction 24 would have explained the circumstances allowing the insurer's actions even if there was no intent to deceive. While not a model of clarity, the proposed instructions did not invite error.

Roesler further claims the jury instructions, even if erroneous, did not prejudice TIG. "Faulty jury instructions require reversal when (1) we have a substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is

---

[17]  TIG also asked for an instruction on bad faith investigation which stated: "In order to recover for bad faith for failure to investigate a claim plaintiff must show that a more thorough investigation would have uncovered additional facts, which would have resulted in a favorable determination for the insured." (R. Vol. V at 1509-10a) (citing *Timberlake and Fulz*). The court "overruled" the request.

prejudicial." *McInnis v. Fairfield Communities Inc.*, 458 F.3d 1129, 1141 (10th Cir. 2006) (quoting *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002)). "Thus, where a jury instruction is erroneous, we reverse if the jury might have based its verdict on the erroneously given instruction." *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1201 (10th Cir. 1997).

Roesler contends the central issue was the reasonableness of TIG's investigation, not TIG's reasonable belief based on the investigation it made. He argues that, even if the correct instruction had been given, the outcome would be the same. According to Roesler, because the punitive damages award establishes the jury found the investigation unreasonable, it thereby rendered TIG's beliefs regarding Roesler's intent without justification. Consequently, the jury would still find TIG acted in bad faith because it failed to determine Roesler's subjective intent via a reasonable investigation.

We cannot agree. Instructions 23 and 24 denied TIG the full benefit of the legitimate dispute defense under Oklahoma law. TIG presented evidence from which a jury could find TIG reasonably believed it need not further investigate Roesler's subjective intent because any reasonable CRNA would have reported the Burton incident in response to Bullet Point 6. In addition, it sought independent legal advice. We are not persuaded that the jury necessarily found reckless bad faith based solely on TIG's failure to investigate Roesler's subjective intent. Under the erroneous instructions, the jury just as easily could have found

bad faith because it determined Roesler had not intended to deceive TIG.

Moreover, punitive damages could have been based on the unsupported

allegations of lawyer-shopping, the insinuation Roesler did not know of the

neurological damage prior to his application, the improper argument of bad faith

stemming from failing to waive attorney-client privilege or post-litigation

conduct. We conclude the erroneous instructions were prejudicial; we vacate the

verdict and remand for a new trial.[18]

### III. CONCLUSION

The district court did not err in denying TIG's motion for a directed

verdict. However, the court erroneously instructed the jury that a finding of bad

faith was warranted based solely on a finding that Roesler did not intend to

deceive the insurer when completing his application. The error in instruction

prejudiced TIG and, consequently, we must remand for a new trial. We therefore,

**AFFIRM** in part, **REVERSE** in part and **REMAND** for a new trial in accord

---

[18] TIG also claims the amount of $2 million dollars as compensatory damages for pain and suffering is excessive. It points to the uncontested facts that Roesler sought no medical treatment, was out of work for only two weeks and presented no evidence the rescission had affected his earning or reputation. TIG argues the damages are far above any awarded under comparable circumstances. *See Wulf v. City of Witchita*, 883 F.2d 842, 875 (10th Cir. 1989) ("[A] review of awards granted in other comparable cases, indicates that the award should have been no *greater* than $50,000."). Because we remand for a new trial, we need not decide this issue. However, we caution Roesler that the judgments he cites in his brief to support the award were based on substantially more egregious injuries. Such cases are irrelevant to whether an award is excessive in this case.

with this Order and Judgement.

ENTERED FOR THE COURT


Terrence L. O'Brien
Circuit Judge