FILED
United States Court of Appeals
Tenth Circuit

January 25, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

BITUMINOUS CASUALTY
CORPORATION,

Plaintiff-Appellee,

v.

GEORGE POLLARD,

Defendant-Appellant.

No. 12-6010
(D.C. No. 5:10-CV-00379-M)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **MATHESON**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and
**BALDOCK**, Circuit Judge.

George Pollard was injured in an accident while working for North Star Well

Services, Inc. (North Star). North Star's commercial automobile policy (Policy)

issued by Bituminous Casualty Corporation (Bituminous) included an Oklahoma

Uninsured Motorist Coverage Endorsement (UM Endorsement) governed by

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Okla. Stat. tit. 36, § 3636. After the accident, Mr. Pollard submitted a claim for uninsured motorist (UM) coverage under the UM Endorsement. Bituminous denied the claim and filed this action against him seeking a declaration of the rights and obligations of the parties under the UM Endorsement. Mr. Pollard filed a counterclaim alleging breach of its duty of good faith and fair dealing. The district court granted summary judgment in favor of Bituminous on all claims. Mr. Pollard filed a timely notice of appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. The Accident

The parties stipulated to the following facts[1] describing the circumstances of Mr. Pollard's accident. On June 24, 2008, North Star dispatched Mr. Pollard and his crew to work on a well. Mr. Pollard drove a workover rig to the well site. The workover rig was a "covered auto" under the Policy.

The workover rig has an attached derrick that is 96-feet tall when fully raised. The rig serves two functions: (1) driving with the derrick down and (2) supporting work at well sites with the derrick raised. These two functions cannot occur at the same time. When Mr. Pollard drove the workover rig to the well site, the derrick rested on top of the single-passenger truck cab with its top half telescoped down into

---

[1] The parties filed a joint stipulation of undisputed facts in the district court, which they represented as the only facts material to a determination of the coverage issues. *See* Aplt. App. at 1367-70.

its bottom half. Upon arrival at the well site, the crew converted the workover rig from a vehicle into a fixed derrick to work on the well. Mr. Pollard backed the rig to within several feet of the well hole. He set the emergency brake and the well site brakes in the cab of the rig. He left the engine running and, after exiting the cab, switched a lever on the side of the rig from "road gear" to "rig gear" to change the transmission from powering the wheels to powering the hydraulics for the derrick and winch drums.

The crew next unwrapped the "guide wires" (more commonly known as "guy wires" or steel safety cables) connected to the top of the derrick. They lowered hydraulic leveling jacks on the back of the workover rig to the ground to lift the back of the truck. This step stabilized the rig and kept it from turning over once the derrick was raised.

After hydraulically raising the derrick into a vertical position, the crew then raised it to its full 96-foot height, using latches to hold the top section in place. The crew secured and tightened the guide wires extending from the top of the derrick to "dead men" (steel anchors permanently buried in the ground) to keep the rig from falling over. Two of the four legs of the derrick were connected to and rested upon swivels on the back of the workover rig, while the other two legs ended in jacks, which rested on boards placed on the ground. When the workover rig was fully "rigged up," it could not be moved.

Although the workover rig was ready to service the well, the crew could not begin their work because the horse head end of the pump jack's walking beam was down and blocking the well hole. Mr. Pollard climbed on top of the pump jack's gearbox and attached a cable and chain from the workover rig's utility winch to the pump jack's counterweights, which were in the up position, to pull them down and raise the end of the pump jack that was blocking the well hole. While Mr. Pollard was standing on the pump jack's gearbox and holding the winch line in place, the counterweights fell. The pump jack's equalizing arm struck him on the head.

**B.      Mr. Pollard's UM Claim and the District Court Proceedings**

After receiving workers' compensation (WC) benefits from Bituminous for his injury, Mr. Pollard submitted a UM claim in August 2009. Bituminous denied his claim and filed this action against him. Mr. Pollard filed a counterclaim, contending that Bituminous breached its duty of good faith and fair dealing by failing to reasonably and fairly investigate, evaluate, and pay his claim.

The parties disputed whether Mr. Pollard was an insured under the UM Endorsement, which defined "[i]nsured" to include anyone "occupying" a "covered auto." Aplt. App. at 10 (quotations omitted). The UM Endorsement defined "occupying" to mean "in, upon, getting in, on, out or off." *Id.* at 12. Mr. Pollard maintained that he was occupying a covered auto—the workover rig—at the time of the accident because he was holding onto and using its winch line. Bituminous

- 4 -

countered that Mr. Pollard was not "occupying" the workover rig as the term "occupying" is defined in the UM Endorsement.

Assuming Mr. Pollard was insured, the parties also disputed whether he was otherwise entitled to coverage for his injury under the UM Endorsement. He claimed that (1) his injury arose out of the workover rig; (2) the rig was an uninsured motor vehicle;[2] and (3) the operator or the owner of the rig was at fault. He advanced three theories regarding who was at fault for his injury. First, he claimed that his co-worker negligently operated the workover rig, specifically the rig's winch line. Second, he alleged that North Star, the owner of the workover rig, was negligent in instructing him on how to use the rig. Third, he contended that North Star was also negligent in maintaining the rig by failing to repair hooks designed to hold a safety harness that would have prevented him from falling. For its part, Bituminous did not dispute Mr. Pollard's contention that the workover rig was both a "covered auto" and an uninsured motor vehicle. But Bituminous maintained there was no coverage under the UM Endorsement because Mr. Pollard's injury did not arise from the use of a motor vehicle in its transportation mode.

---

[2] Mr. Pollard maintains that the workover rig was uninsured because his negligent co-worker was "immune from tort liability under the worker's compensation exclusive remedy doctrine." Aplt. Opening Br. at 5 (citing *Torres v. Kan. City Fire & Marine Ins. Co.*, 849 P.2d 407 (Okla. 1993)). He also contends that "North Star . . . was either uninsured by virtue of the worker's compensation exclusive remedy, or underinsured if exclusive remedy does not apply." *Id.* at 38.

The parties filed cross motions for summary judgment on the coverage issues, and Bituminous also moved for summary judgment on Mr. Pollard's bad-faith claim. The district court initially granted summary judgment in favor of Bituminous only on the bad-faith claim. It reasoned that there was a legitimate dispute between the parties as to whether Mr. Pollard was covered under the UM Endorsement and that he failed to establish conduct by Bituminous that could reasonably be determined as tortious. It denied summary judgment on the coverage questions based on disputed fact issues.

After that ruling, the parties submitted their stipulation of facts, and the district court determined that the UM Endorsement did not cover Mr. Pollard. The court concluded that, at the time of the accident, Mr. Pollard was not "occupying" the workover rig because the "accident occurred not while he was in, upon, getting in, on, out or off the insured workover rig but while he was standing on the gearbox of the pumpjack." *Id.* at 1374. It further concluded that "when the accident occurred the insured workover rig had been completely converted from its transportation mode into its well servicing mode and could not be moved." *Id.* The district court held that, because Mr. Pollard was not occupying the workover rig, and because the workover rig was not in a transportation mode, he was not entitled to coverage under the UM Endorsement. The court therefore entered summary judgment in favor of Bituminous on the coverage issues.

## II.    DISCUSSION

"We review the district court's summary judgment order de novo, and apply the same legal standards as the district court." *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012) (quotation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Our review of the district court's interpretation of Oklahoma law is de novo. *Cooper v. Cent. & Sw. Servs.*, 271 F.3d 1247, 1251 (10th Cir. 2001). We must "ascertain and apply Oklahoma law with the objective that the result obtained in federal court should be the result that would be reached in an Oklahoma court. In so doing, we must apply the most recent statement of state law by the state's highest court." *Id.* (citation and quotations omitted). "When the highest state court has not ruled on a question of state law, our task is to predict how that court would rule on the issue." *Lampkin v. Little*, 286 F.3d 1206, 1210 (10th Cir. 2002).

## A.    Statutory Requirements for UM Coverage

Section 3636 of Title 36 of the Oklahoma Statutes "mandates UM coverage to protect insured persons from monetary loss due to personal injury resulting from an accident caused by another who carries no liability insurance." *Ply v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 81 P.3d 643, 647 (Okla. 2003). Section 3636 provides, in relevant part:

> A. No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the

- 7 -

ownership, maintenance or use of a motor vehicle shall be issued, delivered, renewed, or extended in this state with respect to a motor vehicle registered or principally garaged in this state unless the policy includes the coverage described in subsection B of this section.

B. The policy referred to in subsection A of this section shall provide coverage therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles . . . because of bodily injury, sickness or disease, including death resulting therefrom.

The Supreme Court of Oklahoma has construed § 3636 as mandating UM coverage when:

1) the injured person is an insured under the UM provisions of a policy; 2) the injury to the insured has been caused by an accident; 3) the injury to the insured has arisen out of the ownership, maintenance or use of a motor vehicle; and 4) the injured insured is legally entitled to recover damages from the owner or operator of the uninsured motor vehicle.

*Ply*, 81 P.3d at 647 (footnotes and quotations omitted). That court has further stated that "a two-prong test is necessary to determine whether an injury is within the UM coverage contemplated by § 3636: 1) is a use of the vehicle connected to the injury; and, 2) is that use related to the transportation nature of the vehicle." *Safeco Ins. Co. of Am. v. Sanders*, 803 P.2d 688, 692 (Okla. 1990). We refer to this test as the "transportation-use requirement."

## B. Mr. Pollard's Appeal Issues

Mr. Pollard contends that he was an insured under the UM Endorsement because he was "occupying" the workover rig when the accident occurred. He also argues that the transportation-use requirement applies only to the extent that his UM claim is based on operator (i.e., his co-worker's) negligence and does not apply to his

- 8 -

UM claim based on owner (i.e., North Star's) negligence.  He further asserts that the

workover rig was in a transportation mode when he was injured because it was being

used for its inherent and intended function—the servicing of a well.  Finally,

Mr. Pollard argues that the district court erred in granting summary judgment for

Bituminous on his bad faith claim.

In the following three subsections, we hold that the district court did not err in

granting summary judgment to Bituminous.  First, the transportation-use requirement

applies to both owner-fault and operator-fault UM claims.  Second, the workover rig

was not in use as a motor vehicle at the time of the accident.  Due to our conclusions

on the transportation-use issues, we need not decide whether Mr. Pollard was

occupying the workover rig at the time of the accident.  Third, the district court did

not err in granting Bituminous summary judgment on Mr. Pollard's bad faith claim.

### 1.      Does the Transportation-Use Requirement Apply to UM Claims Based on Owner Fault?

Mr. Pollard contends that the transportation-use requirement does not preclude

his UM claim.  He notes that, under § 3636(A), the insured's injury may arise out of

the "ownership, maintenance, *or* use of a motor vehicle." (emphasis added).  In

addition, a UM claim may be based on either owner fault *or* operator fault.  *See*

§ 3636(B); *see also Ply*, 81 P.3d at 648 (construing the phrase "legally entitled to

recover" in § 3636(B) as "refer[ring] to issues of fault.").  Mr. Pollard maintains that

the transportation-use requirement applies only when the insured's injury arises out

of the *use* of a motor vehicle, as opposed to the *ownership* or *maintenance* of the

- 9 -

vehicle, and only if the UM claim is based on *operator* fault, as opposed to *owner* fault. He further asserts that the transportation-use requirement is limited to determining whether an individual—here his co-worker—was an "operator" of an uninsured motor vehicle under § 3636(B). Mr. Pollard therefore contends that the district court erred in applying the transportation-use requirement to the extent his UM claim is based on North Star's negligence.

We agree with Mr. Pollard that, under § 3636(A), the transportation-use requirement applies to a UM claim alleging an injury that arose out of the "use" of a motor vehicle. We need not decide whether the requirement applies to an injury arising solely out of the ownership or the maintenance of a motor vehicle because Mr. Pollard did not make such a claim in this case. Although he does allege that his injury is based upon the ownership and/or the maintenance of the workover rig, he claims that he was injured while *using* the workover rig. His injury therefore allegedly arose out of the use of that vehicle. *See Sanders*, 803 P.2d at 692 ("[I]f the facts establish that a motor vehicle or any part of the motor vehicle is the dangerous instrument which starts the chain of events leading to the injury, the injury arises out of the use of the motor vehicle, as contemplated by . . . § 3636.")

We disagree with Mr. Pollard that the transportation-use requirement only applies when an insured is legally entitled to recover damages from the operator, as opposed to the owner, of an uninsured motor vehicle under § 3636(B). Although the Oklahoma Supreme Court has not applied the transportation-use requirement in a

- 10 -

case involving a UM claim based solely on owner fault,[3] its rationale in adopting the requirement does not distinguish between claims alleging operator or owner fault.

The court first applied the transportation-use requirement in *Sanders*, which involved the abduction and murder of two people. *See* 803 P.2d at 689. The abductors encountered the victims sitting in a parked car, forced them into the trunk of the car, drove it, parked it, and set it on fire with the victims still locked in the trunk. *Id*. The victims' personal representatives submitted claims for UM coverage under the policy insuring the car, *id.*, on the theory that the abductors were uninsured operators of that vehicle, *see id.* at 695-96. The insurer of the car denied the claims and filed a declaratory judgment action in federal district court. *Id.* at 689. That court certified several questions to the Oklahoma Supreme Court, "present[ing] first impression issues as to whether loss (personal injury or death) is sufficiently related to the use of a motor vehicle by an uninsured operator to come within UM coverage as contemplated by . . . § 3636." *Id.* at 689-90.

The first three certified questions in *Sanders* asked whether (1) the murders arose out of the use of a motor vehicle as contemplated by § 3636; (2) there was a causal connection between the murders and the use of the vehicle; and (3) the

---

[3] In *Ply*, the injured party seeking UM coverage claimed that the owner of an uninsured vehicle was at fault. *See* 81 P.3d at 645. But the Oklahoma Supreme Court did not address whether the transportation-use requirement was satisfied—or even whether it applied—because those issues were not within the scope of the certified question the court was considering. The court stated that "[t]he certified question assumes that Ply's injury is causally connected to use of a motor vehicle in its transportation nature." *Id.* at 647 n.9.

- 11 -

abductors' acts severed any causal link. *Id.* at 690. The court noted that it had not yet "established a causal connection test for [UM] coverage." *Id.* Nor had it decided the meaning of "arising out of the ownership, maintenance or use of a motor vehicle," as that phrase is used in § 3636(A). *Id.* (quotation omitted). But the court had construed that same phrase as used in liability insurance policies. In that context it had established a "chain of events test . . . for deciding whether the facts show that an injury arises out of the ownership, maintenance or use of a motor vehicle." *Id.* at 691. Under that test, "if the facts establish that a motor vehicle or any part of the motor vehicle is the dangerous instrument which starts the chain of events leading to the injury, the injury arises out of the use of the motor vehicle." *Id.* at 692.

After the Oklahoma Supreme Court determined in *Sanders* that this chain-of-events test also applies under § 3636, *see id.*, it said that, "in ascertaining the scope of the mandated UM coverage, 'arising out of the use of a motor vehicle' and 'caused by' or causal connection are not synonymous." *Id.* at 691. It concluded that "a two-prong test is necessary to determine whether an injury is within the UM coverage contemplated by § 3636." *Id.* at 692. That test, the transportation-use requirement, asks: "1) is a use of the vehicle connected to the injury; and, 2) is that use related to the transportation nature of the vehicle"? *Id.*

The court's rationale for adopting this transportation-use requirement belies Mr. Pollard's contention that it only applies when the insured's claim is based on an operator's negligent use of an uninsured vehicle. The court stated,

> [T]he legislative mandate in § 3636 is that UM coverage shall include injury for which the *owner or operator* of an uninsured motor vehicle is liable. For purposes of UM coverage, the broad spectrum of factual sequences within 'arising out of the ownership, maintenance or use of a motor vehicle' is limited by § 3636 to factual sequences involving an uninsured motorist.

*Id.* at 691 (emphasis added). The court also looked to the Oklahoma legislature's use of the phrase "uninsured motorist" in the bills enacting UM coverage as indicating "an intent that the injury be connected to a motorist's use of a vehicle." *Id.* at 692. Then, citing § 3636(B), the court stated, "The requirement . . . that the insured be legally entitled to recover damages from the *owner or operator* of an uninsured motor vehicle implies an intent that there be a connection between the motoring or transportation use (use related to the inherent nature of a motor vehicle) by an uninsured motorist and the injury to the insured." *Id.* (emphasis added). We find no indication in the court's reasoning that the transportation-use requirement does not apply to UM claims based on owner fault.

Nor is the transportation-use requirement applied solely to determine whether an individual was an "operator" of an uninsured motor vehicle under § 3636(B), as Mr. Pollard contends. To be sure, the final certified question in *Sanders* asked whether the abductors were "operators" of an uninsured motor vehicle. *See id.* at 689 (quotation omitted). And the court incorporated the transportation-use requirement into its definition of "operator" as being "any person who is engaged in activity related to the transportation nature of the vehicle." *Id.* at 696. But the court previously explained that the transportation-use requirement was necessary to

- 13 -

determine under § 3636 whether an injury was causally connected to an uninsured motor vehicle. *See id.* at 691-94. And before addressing whether the abductors in *Sanders* were "operators," the court had already concluded that their act of setting the car on fire was "so contrary to [the] transportation nature of the vehicle that, as a matter of law, . . . [the] injury resulting therefrom [was] not within the UM coverage mandated by § 3636." *Id.* at 695. Therefore, its subsequent holding that the abductors were not operators of the uninsured motor vehicle was not, as Mr. Pollard asserts, the dispositive issue that prevented UM coverage in *Sanders*.

We conclude that the transportation-use requirement adopted by the Oklahoma Supreme Court in *Sanders* applies to a UM claim alleging an injury that arose out of the use of a motor vehicle, including when the injury also arose out of the ownership and/or maintenance of the vehicle, as Mr. Pollard alleged. And the requirement applies regardless of whether the insured is legally entitled to recover damages from the owner or the operator of the uninsured motor vehicle under § 3636(B). To be entitled to coverage under the UM Endorsement, Mr. Pollard was therefore required to show (1) that a use of the workover rig was connected to his injury and (2) that use was related to the transportation nature of the workover rig. *See Sanders*, 803 P.2d at 692.

- 14 -

**2.      Did the District Court Err in Concluding that the Workover Rig Was Not Being Used in a Transportation Mode at the Time of the Accident?**

Mr. Pollard contends that the workover rig was being used in a transportation mode at the time of the accident because the winch portion of the rig was being used for its inherent function. We disagree. The steps taken by Mr. Pollard and his crew to transform the workover rig from a motor vehicle into a fixed derrick severed any causal connection between the transportation nature of the workover rig and Mr. Pollard's injury. Accordingly, his injury was not within the coverage mandated by § 3636, and he was not covered under the UM Endorsement.

**a.      The Transportation-Use Requirement in *Sanders* and *Mayer***

The Oklahoma Supreme Court stated in *Sanders* that "'transportation use' cannot be conclusively defined," and "whether a use of an uninsured motor vehicle is related to the transportation nature of the vehicle is necessarily a question of fact to be determined in each case." 803 P.2d at 693. But the court nonetheless concluded, as a matter of law, that "the acts of cutting the fuel line and igniting the fuel after the car was parked, which caused the car to burn, are so contrary to [the] transportation nature of the vehicle that . . . these events are not related to its transportation nature." *Id.* at 695.

The Oklahoma Supreme Court reached a similar holding in *Mayer v. State Farm Mutual Automobile Insurance Co.*, 944 P.2d 288 (Okla. 1997). In that case, the plaintiff was injured by the truck bomb detonated adjacent to the Alfred P. Murrah

- 15 -

Federal Building in Oklahoma City in 1995. *See id.* at 289. He sought UM coverage

under his own automobile policy on the theory that the truck containing the bomb

was an uninsured motor vehicle. The trial court granted summary judgment in favor

of the insurer, and the plaintiff appealed. *See id.*

Citing *Sanders*' two-prong causal-connection test, the Oklahoma Supreme

Court explained in *Mayer* that "[s]ubsection B of § 3636 has been understood to give

indication of an intent that there be a causal connection between the vehicle's

inherent function as a means of transportation and the accidental injuries which are

the subject of suit." *Id.* at 290 & n.7 (italics omitted). The plaintiff argued that the

criminal act of using a truck as a launching pad for a bomb was "inextricably

connected to the 'use' of the uninsured truck. But for the vehicle (which the assailant

drove to the site) [the plaintiff's] injuries would not have occurred." *Id.* at 290. The

court disagreed, stating that this contention "utterly ignores the law's requirement

that the uninsured vehicle be in use as a motor vehicle at the time of injury." *Id.* at

291 (italics omitted).

In applying the transportation-use requirement to the facts presented in *Mayer*,

the Oklahoma Supreme Court observed that, at the time of the explosion, the criminal

actor had ceased driving and had parked the truck. *Id.* Moreover, "[t]he only

claimed transportation connection [was] the uninsured vehicle's *antecedent* use to

transport the explosive materials close to the chosen target." *Id.* The court also

noted that the "intentional act of the perpetrator did not call for the use of

transportation during the commission of the crime," and the vehicle's employment as a weapon was "completely incongruous with its transportation function and without a causal link to locomotion." *Id*. (italics omitted). The court concluded that "[t]he site's destruction by the truck's contents occurred after the vehicle's transportation use had been *abandoned*." *Id*. And, similar to its holding in *Sanders*, the court held that the criminal act of using the truck as a bomb "*severed* from the ensuing explosion the requisite transportation nexus to the vehicle." *Id*. The *Mayer* court held that the "causal connection between the injuries and the truck's function as a method of transport [was] absent." *Id*.

The Oklahoma Supreme Court concluded in *Sanders* and *Mayer* that criminal acts involving motor vehicles were wholly contrary to the transportation nature of the vehicles. Our task is to predict how the Oklahoma Supreme Court would rule on the issue presented here. *See Lampkin*, 286 F.3d at 1210. We conclude it would hold that the workover rig was not being used in a transportation mode at the time of Mr. Pollard's injury.

### b. Mr. Pollard's Accident and Transportation Mode

After Mr. Pollard drove the workover rig to the well site and parked it, he switched the vehicle's transmission so that it powered only the hydraulics for the derrick and winch drum rather than the truck's wheels. The workover rig was then converted from a motor vehicle into a stationary 96-foot derrick. It was held in place by leveling jacks on the back of the truck that were lowered to the ground and by

guide wires extending from the top of the derrick that were fastened to steel anchors in the ground. The parties stipulated that when the workover rig was fully "rigged up" in this manner, it was not just a momentarily stationary vehicle. When Mr. Pollard was injured, the workover rig *could not be moved*. *Cf. Willard v. Kelley*, 803 P.2d 1124, 1131 (Okla. 1990) (noting that a car in gear with the engine running was in transportation mode even though it was not moving when the injury occurred). The workover rig was therefore not "in use as a motor vehicle at the time of injury." *Mayer*, 944 P.2d at 291 (italics omitted).

Mr. Pollard argues that because the workover rig was being used for one of its inherent and intended functions at the time of the accident, the district court erred in concluding that it was not being used in a transportation mode. He maintains that the use of the workover rig to service a well is part of its transportation nature because the vehicle must be driven from location to location for that purpose. He cites *Casualty Reciprocal Exchange v. Waggoner Drilling Co.*, 340 P.2d 490 (Okla. 1959). In *Waggoner*, a trucking company was hired to dismantle, move, and reassemble an oil well drilling rig. *Id.* at 492. An accident occurred after the rig was transported to and unloaded at the new location about a quarter of a mile off of the highway. *Id.* More specifically,

> [t]he substructure of the rig was in place. The mast was in position to be raised. A line was run from the mast over an A-frame and to a winch on a . . . truck. . . . While the mast was being raised by the . . . winch into an upright position . . . , the drive chain on the . . . truck . . . broke, and the mast fell to the ground resulting in the property damages in question.

- 18 -

*Id.*

The truck's liability insurer appealed a judgment against it for the property damages. *See id.* at 492-93. The insurer argued that the accident, which occurred off of the highway, "did not result from an operation or use of the truck on the highway," as required by the applicable statute and policy terms. *Id.* at 493. The Oklahoma Supreme Court disagreed, finding

> that the trucking company was employed to and did transport an oil well drilling rig and that the disassembling, loading, unloading, and reassembling of the oil rig and transporting it from one lease to another *constituted one continuous act of transportation*, and though the vehicle was off the highway at the time of the resulting damage, the operation or use of the vehicle in reassembling the oil well rig was incident to the transportation of the rig and had a proximate and necessary connection with the operation and use of the vehicle upon the highway within the meaning of [the applicable statute].

*Id.* at 494 (emphasis added).

Mr. Pollard contends that the use of the workover rig in this case was likewise "one continuous act of transportation," *id.*, but *Waggoner* is distinguishable. First, the case involved property-damage liability rather than UM coverage. Second, the court construed a statutory requirement that is different from the terms of § 3636. Third, and most important, the facts regarding the use of the truck in *Waggoner* are distinguishable. In that case, the reassembly of the oil well drilling rig off of the highway "was incident to the transportation of the rig" and therefore had a "proximate and necessary connection with the operation and use of the vehicle upon the highway." *Waggoner*, 340 P.2d at 494. Here, in contrast, the conversion of the

workover rig into a fixed derrick to service a well was not incidental to the rig's previous use as a motor vehicle. As the court explained in *Mayer*, the pertinent question for UM coverage is not whether a vehicle was being used for any intended function, but whether there was a causal connection between the accidental injury and "the vehicle's *inherent function as a means of transportation*." 944 P.2d at 290 (additional italics omitted). Once the workover rig was rigged up and immovable, the crew's work involving the rig did not call for the use of transportation, and the rig's antecedent function as a means of transportation had therefore ceased. *See id.* at 291. Consequently, there was no causal connection between Mr. Pollard's injuries and the workover rig's function as a method of transport. *See id.*

Because transportation use of the uninsured vehicle is a necessary element of Mr. Pollard's claim for UM coverage, and because he failed to satisfy that requirement, we need not address the district court's alternative basis for granting summary judgment in favor of Bituminous on the coverage issues. Accordingly, we do not decide whether Mr. Pollard was "occupying" the workover rig at the time of the accident. We affirm the district court's grant of summary judgment in favor of Bituminous because the workover rig was not in a transportation mode when Mr. Pollard was injured. He is therefore not entitled to coverage under the UM Endorsement.

**3.    Did the District Court Err in Granting Summary Judgment in Favor of Bituminous on Mr. Pollard's Bad-Faith Claim?**

Oklahoma law recognizes an insurer's implied duty "to act in good faith and deal fairly with its insured." *Brown v. Patel*, 157 P.3d 117, 121 (Okla. 2007). "Whether an insurer's actions reasonably give rise to an inference of bad faith must be determined in light of all facts known or knowable concerning the claim at the time [the claimant] requested the company to perform its contractual obligation." *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1439 (10th Cir. 1993) (quotation omitted). "A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct." *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 344 (10th Cir. 1995) (quotation omitted). To avoid summary judgment on his bad-faith claim, Mr. Pollard was required to present evidence sufficient to establish "what might reasonably be perceived as tortious conduct on the part of the insurer." *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1256 (10th Cir. 2010) (quotation omitted).

The Oklahoma Supreme Court has stated the elements of a bad-faith claim against an insurer as follows:

> (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury.

*Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009).

- 21 -

Bituminous argues that Mr. Pollard's bad-faith claim fails on the first element because he cannot show that he was entitled to coverage under the UM Endorsement. Citing *Brown*, Mr. Pollard counters that a court's determination that no UM payment is owed does *not* foreclose a bad-faith claim. In *Brown*, the claimant brought an action against the alleged tortfeasor and put his UM carrier on notice. *See* 157 P.3d at 120. The insurer adopted a fence-sitting position, neither denying nor paying the UM claim, and it intervened in the claimant's action against the tortfeasor, asserting inconsistent positions supportive of both parties' positions. *See id.* The claimant then asserted a bad-faith claim against the insurer. *See id.* at 120-21. The insurer argued on appeal that the claimant's bad-faith claim failed because the jury had returned a verdict in favor of the alleged tortfeasor. *See id.* at 129. The Oklahoma Supreme Court disagreed and reversed a grant of summary judgment against the claimant, holding that "[a] substantial question of material fact exist[ed]" regarding the insurer's reasons for intervening in the claimant's action. *See id.* at 130. The court stated that "a subsequent judgment for the tortfeasor does not relieve the insurer of all possible bad-faith claims based upon the insurer's handling of the UM claim." *Id.* at 120.

The Oklahoma Supreme Court has not decided whether to apply the holding in *Brown* beyond the facts presented in that case. *See Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1249 n.3 (10th Cir. 2010). We need not determine the reach of

*Brown* because we conclude that the district court correctly entered summary

judgment in favor of Bituminous on Mr. Pollard's bad-faith claim.  *See id.*

### a.    Was There a Legitimate Dispute Regarding Bituminous's Grounds for Denying Mr. Pollard's UM Coverage Claim?

"The critical question in a bad faith tort claim is whether the insurer had a

good faith belief, at the time its performance was requested, that it had a justifiable

reason for withholding or delaying payment under the policy."  *Ball*, 221 P.3d at 725

(quotation and brackets omitted).  "If there is a legitimate dispute concerning

coverage or no conclusive precedential legal authority requiring coverage,

withholding or delaying payment is not unreasonable or in bad faith."  *Id.*

Mr. Pollard put Bituminous on notice of his UM claim in August 2009.

Bituminous denied the claim via a letter from its counsel to Mr. Pollard's counsel on

February 19, 2010.  Bituminous initially asserted in that letter that Mr. Pollard was

not an insured under the UM Endorsement.[4]  As we indicated earlier, the UM

Endorsement defined "[i]nsured" to include anyone "occupying" a "covered auto,"

Aplt. App. at 10 (quotations omitted), and it defined "occupying" to mean "in, upon,

---

[4] Mr. Pollard contends that this was Bituminous's sole basis to deny his claim, but the letter reflects that Bituminous stated a second and third bases for denial:  that Mr. Pollard was not legally entitled to recover from an owner or operator of an uninsured motor vehicle, and that his injury did not result from the ownership, maintenance, or use of an uninsured motor vehicle.  The third basis cited by Bituminous may have encompassed the transportation-use requirement, although Bituminous did not specifically refer in its letter to the workover rig not being in a transportation mode.  We need not resolve that issue because Bituminous's denial of Mr. Pollard's claim on the first basis was reasonable.

getting in, on, out or off," *id.* at 12. Mr. Pollard's theory is that "occupying" should be broadly construed. And because he was holding a winch line attached to the workover rig at the time of the accident, he maintains that he was "on" or "upon" the vehicle and therefore "occupying" it. Bituminous argues that Mr. Pollard's construction of "occupying" is strained because it is undisputed that he was standing on, working on, and injured by, the pump jack. Bituminous disagrees with his assertion that he was "on" or "upon" the workover rig simply by virtue of holding a winch line that was attached to the vehicle located some distance away.

Mr. Pollard must show there was no legitimate dispute with respect to this issue. He has not. First, no Oklahoma Supreme Court case clearly resolves the issue. *See Ball*, 221 P.3d at 730 (holding there was no controlling legal authority where the Supreme Court had not specifically addressed the relevant coverage issue).[5] Second, the question is not resolved by the clear reading of any statute, existing case law, or the provisions of the UM Endorsement. *Cf. Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 174 (Okla. 2000) (upholding jury verdict in favor of insured on bad-faith claim where UM insurer's legal position based on counsel's advice "was contrary to the unmistakable meaning of the relevant provision(s) of § 3636"; was "at

---

[5] In his supplemental brief, Mr. Pollard invited this court to certify to the Oklahoma Supreme Court the question whether he was "occupying" the Workover Rig at the time of the accident, implicitly acknowledging the lack of controlling precedent from that court on the issue.

odds with existing case law"; and was "inconsistent with a provision of the insurance policy").

Mr. Pollard relies primarily on *Wickham v. Equity Fire & Casualty Co.*, 889 P.2d 1258 (Okla. App. 1994), in which the Oklahoma Court of Appeals addressed the meaning of similar policy language defining "[o]ccupying" as "in, on, getting in or on, or getting off or out of." *Id.* at 1260 (quotations omitted). It held the term "occupying" was "broad enough to include a person . . . who had looked through the trunk [of the covered vehicle] for tools, who was performing repairs on the vehicle, and who was situated next to the vehicle, tightening a lug nut on the wheel." *Id.* at 1261. Although that court concluded that "occupying" should be broadly construed, it "decline[d] to adopt any bright-line test to determine whether someone occupied a vehicle for purposes of UM coverage." *Id.* It held instead "that the determination of whether the policy definition of 'occupying' is satisfied should be left to a case-by-case analysis, depending on the circumstances of the accident, the use of the vehicle, the relevant terms of the coverage at issue, and any underlying public policy considerations." *Id.*

The parties disagree whether the facts of *Wickham* are distinguishable from the facts presented here. But it is not necessary for us to resolve whether Mr. Pollard was "occupying" the workover rig to conclude that he has failed to show the absence of a legitimate dispute. *See Ball*, 221 P.3d at 724 n.40 ("Where the tort claim is factually based on a coverage dispute as to which no controlling legal authority

provides an indisputable resolution, a determination of the coverage dispute is unnecessary because the elements of unreasonableness and bad faith are not present as a matter of law."). We are not persuaded that resolution of the question of Mr. Pollard's status as an insured under the UM Endorsement "was so obvious and inevitable" that Bituminous acted unreasonably in denying his claim. *Flores*, 620 F.3d at 1256.

### b. Was There Other Evidence of Bad Faith Sufficient to Avoid Summary Judgment?

Apart from whether there was a legitimate dispute about coverage, Mr. Pollard maintains that Bituminous's conduct was nonetheless indicative of bad faith. "An insured may pursue a claim of bad faith even when the insurer has a legitimate defense to coverage." *Timberlake Constr. Co.*, 71 F.3d at 343 (stating that "a legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith"). But "to pursue such a claim, the insured must present sufficient evidence reasonably tending to show bad faith." *Id.* (quotation omitted).

Mr. Pollard maintains that Bituminous's investigation of his claim was unreasonable because the insurer denied coverage without interviewing him or any of the eye witnesses to the accident, relying instead on the limited information about the accident in its WC claim file.[6] He also points to evidence that Bituminous's adjusters

_____

[6] The district court held that Bituminous's investigation of Mr. Pollard's claim—specifically its reliance on the WC claim file—was reasonable because the file notes reflected an adjuster's telephone call to Mr. Pollard's home two days after

(continued)

lacked knowledge of Oklahoma's claims-handling standards and its substantive law on UM claims.  He further argues that, although Bituminous determined immediately that it would deny his claim, it delayed communicating its decision for several months while conducting no further investigation.  These contentions lack merit.

First, to sustain a claim of bad faith based on a failure to investigate, Mr. Pollard must show "that material facts were overlooked or that a more thorough investigation would have produced relevant information." *Timberlake Constr. Co.*, 71 F.3d at 345.  He asserts that a reasonable investigation would have put Bituminous on notice, before denying his claim, that he was holding and working with the winch line connected to the workover rig at the time of the accident.  He also argues that Bituminous would have learned of his contention that North Star was negligent in instructing him on how to use the vehicle.  But neither the fact of his using the winch line nor his contention regarding North Star's negligence would have altered Bituminous's reasonable basis for denying coverage:  that he was not "occupying" the workover rig.  Mr. Pollard has not shown that a reasonable insurer, proceeding under facts and circumstances that a proper investigation would have revealed, would not have denied payment.  *See Oulds*, 6 F.3d at 1442.

---

the accident as well as Mr. Pollard's own description of the accident, and because Bituminous had promptly begun payments on his WC claim.  We affirm the district court's decision on other grounds, which we are free to do where the record is sufficient to permit conclusions of law.  *See Gillogly v. Gen. Elec. Cap. Assur. Co.*, 430 F.3d 1284, 1294 n.6 (10th Cir. 2005).

Mr. Pollard's contention that Bituminous acted in bad faith based upon its adjusters' lack of knowledge regarding the specifics of Oklahoma UM law is also unavailing due to this court's precedent. *See Flores*, 620 F.3d at 1256 (rejecting bad-faith claim premised on insurer's failure to train its employees on the specifics of Oklahoma insurance law); *Oldenkamp*, 619 F.3d at 1249 (rejecting claim that insurer's coverage position based on the policy terms was not reasonable because its representative was unaware of a relevant regulation).

Nor does the lapse between Mr. Pollard's notice of his UM claim and Bituminous's denial support a finding of bad faith. He contends that Bituminous delayed its response based on a need for further investigation, when in fact it did no further investigation. But Bituminous informed him that its investigation involved determining whether the UM coverage was applicable, and there is no dispute that Bituminous did proceed to seek a coverage opinion from its counsel. Moreover, he "must show that the alleged violation of the duty of good faith and fair dealing was the direct cause of damages." *Id.* at 1250. We note that Mr. Pollard did not submit his UM claim until more than a year after the accident. He fails to show that he was damaged by any delay in Bituminous's communication of its denial of his claim.

Because Mr. Pollard failed to present evidence sufficient to establish "what might reasonably be perceived as tortious conduct on the part of the insurer," *Flores*, 620 F.3d at 1256 (quotation omitted), we affirm the district court's grant of summary judgment in favor of Bituminous on Mr. Pollard's bad-faith claim.

## III. CONCLUSION

The judgment of the district court is affirmed.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge